In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00015-CR


______________________________




JIMMY HORACE OAKLEY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 33,128-A




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 A Gregg County jury found Jimmy Horace Oakley guilty of aggravated assault with a deadly
weapon and assessed punishment at seventy-five years' imprisonment. He challenges the legal and
factual sufficiency of the evidence to support his conviction and contends the sentence was
disproportionate to the offense. We affirm the trial court's judgment.

I. FACTUAL BACKGROUND

 The jury heard the following evidence: On February 27, 2005, Oakley had been dating
Carmilla Anderson for six to eight months. The two lived together in the home of Oakley's sister. 
Oakley picked up Anderson from her job early in the day, and the two went to visit Anderson's
daughter, Amanda Bridges, with whom Oakley did not get along. Oakley, Anderson, Bridges, and
Thomas Martin, Bridges' boyfriend, all seemed to be getting along extraordinarily well that day and
decided to have a barbeque. Before the barbeque got underway, Oakley and Anderson went to their
home, changed clothes, and drank a large amount of gin. The couple returned, and Martin began to
grill the food. 

 Before the food was finished, however, Oakley became ill. Anderson brought him home,
where Oakley passed out in bed. Anderson decided to return to her daughter's house, but was unable
to relay that information to the sleeping Oakley. 

 Anderson was in the back bedroom playing video games with Bridges. Martin was in the
bedroom as well. In the early morning hours, a friend and neighbor named Michael Balker joined
them, and Anderson and Bridges continued to play video games. According to Anderson, Bridges,
and Martin, someone began to pound loudly on the door a few minutes after Balker arrived. Martin
went to the door and asked the person to identify himself. There was no response, and the person
again pounded on the door and began to yell and curse. 

 Anderson recognized the voice as Oakley's and sensed that he was very angry. She testified
that Oakley very rarely let her go anywhere alone and that, in a panic, she hid in a makeshift closet
in the bedroom. Martin let Oakley into the house and directed him to the bedroom where he could
talk to Bridges. In response to Oakley's question regarding her mother's whereabouts, Bridges lied
and said that she had dropped off Anderson in nearby Easton to visit a friend. Oakley then
demanded the keys to Anderson's car, and Bridges refused. It was then, according to Anderson,
Bridges, and Martin, that Oakley pulled a gun from his pants and pointed it at Bridges. 

 From her hiding spot, Anderson was able to hear the confrontation and was able to see the
gun in Oakley's hands. When she saw the gun, she lunged out of the closet in an effort to grab the
gun. When she did, Oakley hit her with the gun and continued hitting her in the head with the gun
several times and chastising her about lying to him. As he beat her with the gun and Anderson
begged him to stop, the gun discharged at least twice, perhaps more. Bridges was able to hit Oakley
twice with the small television with enough force to knock him through the bedroom door into the
living room. When Bridges hit Oakley with the television the second time, Oakley grabbed
Anderson by the throat, pulled her into the living room with him, and continued to beat her. Bridges
then directed her mother to duck, and Bridges hit Oakley with a portable heater. This allowed
Anderson to make it to the front door and unlock the locks. As Anderson held on to the doorknob,
Oakley pulled her by the back of her shirt, and the door opened. 

 Longview police officers, who had responded to the report that shots had been fired, were
already outside. Anderson, bloody and dazed, fell out of the door and crawled out of the house,
followed shortly by Oakley. Anderson was taken to the emergency room, as was Oakley, who
claimed to have suffered a seizure in the back of the squad car following his arrest at the scene. 
Anderson received forty-nine sutures in her head and testified that her vision and memory have been
adversely affected by the beating. The doctor who attended to Anderson at the emergency room
testified to the several lacerations and contusions, as well as the swelling Anderson suffered as a
result of the beating. 

 Oakley testified at trial and communicated a different version of events. He claims that he
returned to Bridges' house to remind Anderson that the two had to get up early for church on Sunday
morning. He denied having pounded on the door and having brought a gun to the house. When
Bridges told him that Anderson was in Easton, Oakley explained that he was "disappointed,"
apparently suspecting that Anderson was unfaithful. He claims only to have cursed at Bridges after
he heard the news and that, at that point, someone attacked him from the closet. The assailant,
according to Oakley, first kicked him and then hit him with an object. He was able to wrestle away
the object, discovered it was a gun, and was mindful to make sure that it was fully discharged before
continuing the altercation. He then continued to beat this unidentified person with the weapon he
had taken. Throughout the incident, he maintained, the person made no sound from which he might
have recognized that it was Anderson. He claimed that the darkness in the house and his near
blindness in one eye prevented him from knowing who the assailant was until he saw Anderson as
she stumbled out the door. When Oakley realized who had attacked him and whom he had beaten
in the head with a gun, he testified, he was "hurt" that she would do such a thing to him. At the trial,
Oakley claimed he acted only in self-defense. The jury was instructed on self-defense, but, in
returning its guilty verdict, rejected Oakley's version of events. 

II. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE 

A. Applicable Law

 1. Aggravated Assault

 A person commits aggravated assault if the person commits assault as defined in Section
22.01 of the Texas Penal Code (1) and the person: (1) causes serious bodily injury to another, including
the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault. 
Tex. Penal Code Ann. § 22.02 (Vernon Supp. 2006). Here, Oakley was convicted of aggravated
assault using or exhibiting a deadly weapon. See Tex. Penal Code Ann. § 22.02(a)(2).

 2. Self-Defense

 A person is justified in using force against another when and to the degree he or she
reasonably believes the force is immediately necessary to protect himself or herself against the
other's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a) (Vernon 2003);
see Frank v. State, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985). One has the right to defend
against a reasonable appearance and apprehension of apparent danger to the same extent as against
actual danger. Dyson v. State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984).

 "Deadly force" means "force that is intended or known by the actor to cause, or in the manner
of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code
Ann. § 9.01(3) (Vernon 2003). Additional requirements apply to the use of deadly force. See Tex.
Penal Code Ann. § 9.31(d) (Vernon 2003). A person is justified in using deadly force against
another if the following requirements are satisfied:

 (1) if he would be justified in using force against the other under Section
9.31;


 (2) if a reasonable person in the actor's situation would not have retreated; and

 (3) when and to the degree he reasonably believes the deadly force is
immediately necessary:


 (A) to protect himself against the other's use or attempted use of
unlawful deadly force; or


 (B) to prevent the other's imminent commission of aggravated
kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or
aggravated robbery.


Tex. Penal Code Ann. § 9.32(a) (Vernon 2003). From this, we point out that use of deadly force
is justified only when retreat is unreasonable. (2) See Frank, 688 S.W.2d at 868. The test is whether
a reasonable person in the actor's situation would have retreated. Id.

 3. Burdens of Production and Persuasion

 The issue of self-defense is one of fact to be determined by the jury. See Saxton v. State, 804
S.W.2d 910, 913 (Tex. Crim. App. 1991). Here, then, Oakley had the burden to prove by a
preponderance of the evidence that he acted in self-defense when he repeatedly struck Anderson in
the head with the gun. See Tex. Penal Code Ann. § 2.04(d) (Vernon 2003). Once a defendant
raises the issue of self-defense, the State then bears the burden to persuade the jury, beyond a
reasonable doubt, that the claim of self-defense is not true. See Zuliani v. State, 97 S.W.3d 589, 594
(Tex. Crim. App. 2003). The State need not specifically disprove the issue of self-defense. Rather,
the burden is incorporated into the State's burden to prove its case. See Saxton, 804 S.W.2d at 913. 
A jury's verdict of guilty is an implicit rejection of the defendant's self-defense theory. Id. at 914.

B. Legal Sufficiency of the Evidence

 1. Standard of Review

 In reviewing the legal sufficiency of the evidence to support a conviction, we view all the
evidence in the light most favorable to the judgment where the jury is the trier of fact. Cardenas v.
State, 30 S.W.3d 384, 389-90 (Tex. Crim. App. 2000). The critical inquiry is whether, after so
viewing the evidence, any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt. See Saxton, 804 S.W.2d at 914.

 2. Legally Sufficient Evidence to Support Jury's Verdict

 Viewing the evidence in a light most favorable to the verdict, we point to the testimony of
Anderson, Bridges, and Martin to conclude the evidence is legally sufficient to prove beyond a
reasonable doubt each element of aggravated assault against Anderson. (3)

 According to all three witnesses, Oakley came back over to the house in an angry, hostile
state of mind and was looking for Anderson. Fearful of Oakley, Anderson hid in the makeshift
closet area. Testimony from Anderson, Bridges, and Martin consistently describe the moment at
which Oakley took the gun from his waistband in response to Bridges' refusal to give him the keys
to her mother's car. All three witnesses testified that Oakley pointed the gun at Bridges. Anderson
explained that she had seen Oakley carry the gun on at least one prior occasion when Oakley brought
the gun to "the blind man's house." Anderson added that Oakley had told her it was a .38-caliber
handgun. Able to see that Oakley was pointing this gun at Bridges, Anderson leapt from the closet,
reaching for Oakley's arm in such a way as to prevent him from shooting her daughter. According
to Bridges, Anderson jumped out "[l]ike she was reaching for something." Similarly, Martin
explained that Anderson "jumped up and tried to grab [Oakley's] hand." 

 The record indicates that Oakley first struck Anderson shortly after or as she reached toward
the gun. Oakley then dragged Anderson over the bed to a location between the bed and wall, and
continued to strike her several more times as the gun discharged and as both Anderson and Bridges
were screaming for Oakley to stop.

 It is undisputed that Anderson lunged out of the closet, and Oakley argues he was reasonable
in defending himself from this assailant whose identity he claimed to be unknown at the time. 
However, Oakley still experiences a number of obstacles in this argument. First, we reiterate a
critical conclusion, that the evidence is legally sufficient to support the conclusion that Oakley
brought the gun to the house to find out where Anderson was and that he pointed the gun at Bridges
when Bridges refused to give him the keys.

 From that, we first note the jury was instructed that a person is not justified in acting in
self-defense if he or she seeks an explanation from or discussion with the other person while illegally
carrying a weapon as defined by Section 46.02. See Tex. Penal Code Ann. § 9.31(b)(5)(A)
(Vernon 2003); Williams v. State, 35 S.W.3d 783, 785 (Tex. App.--Beaumont 2001, pet. ref'd). 
Under Section 46.02, a person commits an offense if he or she intentionally, knowingly, or recklessly
carries on or about his or her person a handgun, illegal knife, or club. See Tex. Penal Code Ann.
§ 46.02 (Vernon 2003). The record supports the conclusion that Oakley brought a handgun to the
encounter. In addition to that evidence, the State presented evidence of Oakley's prior felony
convictions, which means that Oakley could not have possessed a license to carry the handgun. See
Tex. Gov't Code Ann. § 411.172(a)(3) (Vernon Supp. 2006). Based on such evidence, the jury
could have reasonably concluded Oakley could not avail himself of self-defense--even if the
circumstances would have otherwise justified the use of deadly force--because he brought the gun
to the house to confront Anderson.

 Further, for the jury to accept Oakley's theory of self-defense, it would have to conclude he
reasonably believed it was immediately necessary to use force to protect himself against Anderson's
use or attempted use of unlawful force. See Tex. Penal Code Ann. § 9.31(a) (Vernon 2003). In
this scenario in which Oakley was pointing a gun at Bridges, the jury could have concluded
Anderson's use of force to defend her daughter was reasonable. See Tex. Penal Code Ann. § 9.33
(Vernon 2003). Therefore, under Section 9.31, it was reasonable for the jury to find that Oakley
could not have been justified in using force to protect himself because he was not defending himself
against the use of unlawful force. Put simply, here, the jury was not required to find that Oakley
acted in self-defense when the record shows that Anderson was justified in acting in defense of her
daughter.

 The record contains evidence that Oakley brought the gun to the house to find out where
Anderson was; that he pointed the gun at Bridges; that, in defense of Bridges, Anderson lunged from
the closet; and that Oakley struck her in the head numerous times with the gun.

C. Factual Sufficiency of the Evidence

 Oakley argues that it was Anderson who had the gun initially and that he had to wrestle it
away from her. He points to his relatively minor injuries as evidence that Anderson first attacked
him violently when he started yelling and cursing at Bridges.

 1. Standard of Review

 In a factual sufficiency review, the appellate court views all the evidence in a neutral light
and determines whether the evidence supporting the verdict is so weak that the jury's verdict is
clearly wrong and manifestly unjust or whether the great weight and preponderance of the evidence
is contrary to the verdict.  Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); see Clewis v.
State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996); Watson v. State, No. PD-0469-03 (Tex. Crim.
App. Oct. 18, 2006), available at http://www.cca.courts.state.tx.us/OPINIONS/
HTMLOPINIONINFO.ASP?OPINIONID=14579.

 2. Factually Sufficient Evidence to Support the Verdict

 The evidence here is factually sufficient to support the jury's rejection of Oakley's self-defense claim. It is the fact-finder's role to weigh the credibility of the witnesses, to believe or
disbelieve the witnesses' testimony, and to reconcile any conflicts in the evidence. See Swearingen
v. State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003). The jury was authorized to accept or reject
Oakley's testimony about returning to the house to issue a friendly reminder about church, only to
be attacked by a then-unknown person who jumped from a closet wielding a gun. See Saxton, 804
S.W.2d at 913. 

 The only evidence contradicting the three witnesses' accounts is Oakley's denial that he
owned or carried a gun. He testified that the gun in evidence likely belonged to his mother, but that
he thought the gun was the one that Bridges and Martin had stolen from Oakley's sister's house on
an earlier date. In light of this conflicting evidence on whether Oakley carried a gun to the
confrontation, the jury was authorized to disbelieve Oakley's statements and, instead, accept the
version of events as Anderson, Bridges, and Martin testified. See id.

 In the neutral light of our factual sufficiency review, we again note that Anderson did initially
charge at Oakley and that, therefore, the jury could have believed that Oakley's actions were
reasonable to defend himself. However, we apply the special rules applicable to the use of deadly
force (4) in self-defense. The jury could have reasonably believed that Oakley brought the firearm with
him to the scene. From that premise, the jury could reasonably conclude that Anderson never
threatened Oakley with the use of deadly force and that there was no basis for Oakley to reasonably
believe Anderson presented a threat of deadly force. In such event, Oakley would not be justified
in the use of deadly force. Tex. Penal Code Ann. § 9.32(a)(3)(A). Additionally, before employing
deadly force, a person has a duty to retreat if a reasonable person would have done so. See Frank,
688 S.W.2d at 868. From the record, we see that a reasonable person would have attempted to
retreat and likely could have done so under these circumstances.

 From the record, we know that Oakley was aware of at least three other people in the house
when he first entered. We also know that the majority of the altercation occurred in the back
bedroom of the house. Anderson and Bridges testified that Oakley dragged Anderson to a spot
between the bed and the wall and beat her as she was on the floor. From the testimony and from the
State's exhibits, we see that Anderson's position put her in a location opposite the door to the
bedroom. In other words, Oakley was between the door and Anderson. Oakley, therefore, was very
near the door with Anderson in the other direction, leaving Oakley within steps of an unobstructed
path of retreat. We add that Anderson testified that she was on the floor as he struck her and that she
soon became nearly lifeless and unable to control her head. Further, Bridges testified that she hit
Oakley twice with a television set and that the blows caused him to stumble out toward the living
room. Instead of running toward the exit, however, Oakley continued to beat Anderson. The record
also reveals that the neighbor, Balker, broke the glass out of a bedroom window as he dove out when
Oakley confronted Bridges, leaving a clear, safe, and immediate escape route from the bedroom.

 The law imposes a duty on Oakley to retreat before using deadly force, and the record
demonstrates that, although Oakley had ample reason and opportunity to do so, he did not. So, even
if the jury were to have believed Oakley's version of events, the evidence was still factually sufficient
to support the jury's rejection of Oakley's argument that his violent attack on Anderson was justified. 
We cannot say the evidence of guilt considered by itself is so weak that the jury's verdict is clearly
wrong and manifestly unjust or that the great weight and preponderance of the evidence is contrary
to the verdict. See Watson, http://www.cca.courts.state.tx.us/OPINIONS/
HTMLOPINIONINFO.ASP?OPINIONID=14579. We, therefore, conclude the evidence is factually
sufficient to support the jury's implied finding against Oakley on the issue of self-defense.

III. PROPORTIONALITY OF SENTENCE

 Oakley also contends the sentence of seventy-five years' confinement is grossly
disproportionate to the offense for which he was convicted. (5) 

 Texas courts have traditionally held that, as long as the punishment assessed is within the
range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or
unusual. See, e.g., Jordan v. State, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, Oakley's
sentence falls within the applicable range of twenty-five to ninety-nine years or life, a range
enhanced by his two prior felony convictions. See Tex. Penal Code. Ann. §§ 12.42(d), 22.02(b)
(Vernon Supp. 2006).

 However, we have recognized that a prohibition against grossly disproportionate punishment
survives under the Eighth Amendment to the United States Constitution apart from any consideration
of whether the punishment assessed is within the range established by the Legislature. U.S. Const.
amend. VIII; see Jackson v. State, 989 S.W.2d 842, 845 (Tex. App.--Texarkana 1999, no pet.). Our
proportionality analysis is guided by (1) the gravity of the offense and the harshness of the penalty;
(2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed
for commission of the same crime in other jurisdictions. See Solem v. Helm, 463 U.S. 277, 292
(1983); Fluellen v. State, 71 S.W.3d 870, 873 (Tex. App.--Texarkana 2002, pet. ref'd). Only if we
find that the sentence is grossly disproportionate to the offense will we then consider the remaining
factors of the Solem test and compare the sentence received to sentences for similar crimes in the
same jurisdiction and to sentences for the same crime in other jurisdictions. See Alberto v. State, 100
S.W.3d 528, 530 (Tex. App.--Texarkana 2003, no pet.).

 Here, Oakley's seventy-five-year sentence is quite harsh. However, considering his criminal
history and the brutality of the instant offense, we cannot say that the sentence is grossly
disproportionate to the offense. Further, the record contains no evidence comparing this sentence
with others in the same jurisdiction for this offense, or those imposed on defendants in other
jurisdictions who committed a similar offense. See Delacruz, 167 S.W.3d at 906. For all of these
reasons, Oakley has failed to show that his sentence was disproportionate to the offense for which
he was convicted.

IV. CONCLUSION

 We conclude the evidence is legally and factually sufficient to support the jury's implicit
rejection of Oakley's self-defense claim. We further conclude Oakley has failed to show that the
sentence imposed was disproportionate to the offense he committed. Accordingly, we overrule his
points of error and affirm the trial court's judgment.



 Jack Carter

 Justice


Date Submitted: August 30, 2006

Date Decided: October 24, 2006


Do Not Publish

1. Section 22.01 provides that a person commits the offense of assault if he or she:


 (1) intentionally, knowingly, or recklessly causes bodily injury to another,
including the person's spouse;


 (2) intentionally or knowingly threatens another with imminent bodily injury,
including the person's spouse; or


 (3) intentionally or knowingly causes physical contact with another when the
person knows or should reasonably believe that the other will regard the contact as
offensive or provocative.


Tex. Penal Code Ann. § 22.01(a) (Vernon Supp. 2006).
2. As a matter of law, Oakley could not have been in retreat at the moment he utilized deadly
force. See Juarez v. State, 886 S.W.2d 511, 513-14 (Tex. App.--Houston [1st Dist.] 1994, pet.
ref'd); see also Bartmess v. State, 708 S.W.2d 905, 908 (Tex. App--Tyler 1986, no pet.) ("The actual
use of deadly force necessarily implies no retreat at the moment the force was applied. One may be
in retreat and then abandon that retreat by using deadly force.").
3. Oakley does not challenge the deadly weapon element of the offense. The Texas Penal Code
specifically provides that a firearm is a deadly weapon. See Tex. Penal Code Ann.
§ 1.07(a)(17)(A) (Vernon Supp. 2006).
4. Again, "deadly force" means force that is intended or known by the actor to cause, or in the
manner of its use or intended use is capable of causing, death or serious bodily injury. Tex. Penal
Code Ann. § 9.01(3). The Texas Penal Code defines "serious bodily injury" as "bodily injury that
creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted
loss or impairment of the function of any bodily member or organ." See Tex. Penal Code Ann.
§ 1.07(a)(46) (Vernon Supp. 2006). So, even if the jury determined that beating someone in the head
repeatedly with a handgun while the handgun is firing does not create a substantial risk of death, then
the jury was certainly authorized to accept as true Anderson's testimony regarding the lasting impact
her head injuries had on her vision and memory. 
5. Oakley did not object to the sentence on the ground it was disproportionate to the crime, or
on any other ground, at the time it was imposed. However, his motion for new trial contains a
contention that the sentence was disproportionate to the offense. A motion for new trial, in this
context, is an appropriate way to preserve the claim for review. See Williamson v. State, 175 S.W.3d
522, 523-24 (Tex. App.--Texarkana 2005, no pet.); Delacruz v. State, 167 S.W.3d 904 (Tex.
App.--Texarkana 2005, no pet.).