

**NUMBER 13-12-00028-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOSE GUADALUPE
RODRIGUEZ ELIZONDO,                                              Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

**On appeal from the 398th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Justice Benavides**

Appellant, Jose Guadalupe Rodriguez Elizondo, was convicted of murder and sentenced to twenty-five years in prison at the Texas Department of Criminal Justice—Institutional Division. By two issues, Elizondo argues that: (1) the evidence

was legally insufficient to support the jury's rejection of his self-defense argument and (2) the jury charge was erroneous and harmful, requiring reversal. We affirm.

## I. BACKGROUND

The undisputed facts reveal that, on August 8, 2010, appellant Elizondo, his brother Juan, and his wife Maria went to a barbeque at Elizondo's mother house. At the barbeque, Elizondo, Juan, and Maria socialized. Elizondo testified that he drank approximately two beers, while his brother Juan admitted to finishing a six-pack of beer. Maria did not drink at that time. The three then decided to go to Punto 3, a nightclub in Mission, Texas. Punto 3 was owned by Fermin Limon, Sr., his wife Nora, his son Fermin Limon, Jr. (Junior), and his daughter Mireya. Elizondo and Maria went home to change and then proceeded to the bar. Juan was picked up by a friend and arrived later. All of the parties were at the bar by 12:45 a.m. At this point, the versions of what occurred differ, therefore, we will summarize each relevant witness's testimony.

## A. Jose Elizondo

Elizondo, a customs agent employed by the United States Department of Homeland Security, testified that he arrived at the bar with his wife in his white Dodge pickup. He stated that, as a licensed peace officer for the State of Texas, he has an assigned pistol from U.S. Customs. This pistol was in the console of his pickup truck, as well as his credentials identifying him as a federal agent. Elizondo explained that, under federal law, he is authorized to carry a weapon at all times. He left his pistol and credentials in the car when he and his wife entered the club.

Elizondo testified that he had gone into the bar and then went outside, when he saw his wife Maria exit the bar looking "teary-eyed," "emotional," and "in distress." He

2

asked her what was wrong and she said that someone pushed her "really ugly." She pointed to the man who had allegedly pushed her, who turned out to be Junior. Elizondo asked Junior why he had pushed his wife, and he said Junior was cocky and aggressive towards him. Elizondo claimed that he did not know Junior worked at the bar because he was wearing a different shirt than the other Punto 3 employees—he thought Junior was just another customer. Elizondo called Junior a curse word in Spanish and Junior responded by pushing him. Elizondo pushed back. Then, Elizondo claimed that Rigo, another security employee, punched Elizondo on the right side of his face. Elizondo punched back, and then became enthralled in a brawl with at least four nightclub employees. Elizondo believed that he could be killed if he fell to the ground, so as soon as he could, he ran to his truck. The distance from the bar to his truck was approximately seventy yards. Elizondo testified that he could not believe it when he realized his aggressors were following him. He stated that he heard, "Stop, asshole," and that the men tried to trip his boots, but he did not stop running. He ran past a fence to his car. While running, he pulled out the control to his truck and unlocked his pickup. He testified that, at that time, he remembered he had his gun in the truck.

As soon as he arrived at his pickup, Elizondo testified that he got in, closed the door, and grabbed the gun from his console. He wanted to grab his credentials, too, but he claimed that Junior reached in and pulled him out of his truck. After being pulled out, Elizondo claimed he started hitting Junior to protect himself. Then, Elizondo's brother Juan arrived and pulled Junior off of him. At that point, Elizondo then saw a man approaching his vehicle with a gun. This person was Limon. Elizondo testified that

3

Limon pointed the gun at him and did not say anything. Elizondo claimed that he shouted to Limon, "U.S. Customs" and told him to "throw the gun" about two times. He claimed that Limon never lowered his gun. Elizondo fired, claiming he had "no other choice" because he was convinced Limon was going to shoot.

On cross-examination, the prosecution questioned Elizondo with the statement he gave to police the night of the shooting. Although Elizondo testified that he didn't remember he had his gun in his console until he began running to his truck, his statement provided that, "I ran towards my truck where I had my duty issued H & K 40 Caliber handgun." The prosecution suggested that Elizondo ran to the truck specifically to retaliate against the security guards with his gun. Elizondo denied this assertion.

## B.    Juan Elizondo

Juan, appellant's brother, testified that when he arrived at Punto 3 with his friend, Elizondo and his wife were already there. Juan said hello to some friends. He then bought a beer for himself and his brother, and a mixed drink for his sister-in-law Maria. He stated that he saw a fight erupt between two women and that he tried to break up the fight, even though his brother told him "not to get involved." Juan was escorted out of the building by Punto 3 security along with the two fighting women. After explaining the situation to Limon, Sr., whom he thought was the head of security or a manager, he was allowed back inside the club.

As soon as Juan entered, though, he testified that he noticed people running out. He heard a "commotion" and went outside again, because he did not see his brother inside the club. He also thought he heard his sister-in-law Maria yelling. When he got outside, Juan saw Maria "crying" and "yelling." Juan saw "at least three guys hitting"

4

Elizondo when his brother started running to his pickup truck. Juan testified that the three security guards followed his brother, so he ran after them, too. When he arrived at Elizondo's truck, he saw Elizondo and Junior struggling. He pulled Junior off his brother's back and began fighting with him. At that point, he heard his brother yell, "U.S. Customs" and "please put the gun down." Then he heard two gunshots.

## C.    Maria Elizondo

Maria Elizondo, Elizondo's wife, confirmed that her husband and brother-in-law Juan had been drinking at their mother's home prior to going to Punto 3. After she and her husband arrived at the Punto 3 nightclub, Juan handed her a margarita. Maria and her husband then danced two songs. After dancing, Maria talked to some friends while her husband went with his brother. When Maria saw her husband exiting the bar, she started to follow him out. She still had her drink in her hand. She testified that, as she approached the exit, a female employee working at the front entrance stated, "This stupid lady doesn't want to leave her drink behind." Maria went back and set her drink down at the bar, but stated that she was offended by the woman's words. She testified that as she was walking back towards the entrance, Junior arrived and grabbed her. Maria testified that he told her, "I know women like you" and to "get out." Then, according to Maria, Junior pushed her and took her outside. Junior then went back into the club.

Maria, upset, began looking for her husband outside. She noticed Junior had returned outside laughing and she thought he was making fun of her. She found her husband, pointed Junior out to him, and explained that Junior had pushed her inside. Maria stated that Elizondo then asked Junior, "Why were you pushing my wife?"    A

5

fight then ensued. Maria claims that a security guard punched her husband in the face, and that the men were yelling, grabbing, and pushing. She said she yelled at the Punto 3 security guards to leave her husband alone. Then, she testified that her husband started running towards his truck and that the security guards followed him, yelling, "Stop asshole!" She also testified that they were trying to trip him while he was running.

Maria ran to her husband's truck, where all the men had convened. She saw her husband pointing a gun saying, "Lower your weapon. Lower your weapon." She did not hear him say that he was a U.S. Customs agent. Then, Maria heard her husband's gun fire.

**D. Francisco Garcia**

Francisco Garcia worked at Punto 3 as a general employee. His job responsibilities included setting up for the night, cleaning, working at the door to check for weapons and proper age identification, assisting with security, and performing tasks as required by the Limon family. He carried a walkie-talkie and wore a microphone to be in constant communication with his employers throughout the night.

Francisco testified that, at approximately 1:00 a.m. on August 9, 2013, he was summoned by intercom and through his walkie-talkie to report to the bar section because a fight had broken out. He recalled that he, along with four other security guards, escorted two men and two women who had been fighting to the nightclub's exit. He then returned to his assigned watch area that night, the stage area. Seconds later, Francisco testified that he and all other security employees were alerted by their walkie-talkies to report outside. Outside, he noticed a group of people in a fight or "commotion." He witnessed the defendant Elizondo run to a white truck. He then

6

witnessed some of his fellow employees follow Elizondo and then bang on the window of Elizondo's truck. According to Francisco, Elizondo then got out of his truck and hit Junior. He then heard a gunshot and someone yelled, "Run. There's a gun." At that point, Francisco called 911, as he saw his co-workers running from the truck back to the club. He then saw Limon, Sr. running alongside the fence towards the white truck. At that point, he did not see Limon, Sr. carrying a weapon. Once Limon, Sr. got closer to where his son, Junior, and Elizondo were, he noticed that Limon, Sr. and Elizondo were pointing guns at each other. He heard Elizondo tell Limon, Sr. to get on the ground, but Limon, Sr. did not. Instead, he saw Limon, Sr. hold the gun with one hand and make gestures with his other hand as if to calm Elizondo down. Francisco then heard more gunshots and saw Limon, Sr. fall. At that time, Francisco placed his second call to 911.

### E. Rodrigo Hernandez Carrion

Rodrigo Hernandez Carrion (Rigo) also worked at Punto 3 as a general employee. On the night of the incident, Rigo testified that he was called by walkie-talkie to remove some women from the premises for fighting. Outside, he saw Limon, Sr. and Junior talking to two men and a woman. He said the woman (presumably Maria) was hysterical and being disrespectful to Junior, calling him "idiot, stupid, sons of bitches." He heard Elizondo tell Junior, "Don't disrespect my woman you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?"

Rigo then testified that fighting started when Elizondo swung at Limon, Sr. A brawl ensued. Rigo then witnessed Elizondo run to his truck, get in, and "close[] the door and lock[] it." Rigo followed, along with his fellow employees. Rodrigo witnessed Elizondo "looking for something in the console." Junior "got to the truck and was hitting

7

the window," telling him to "Get off asshole." He said that then Juan, Elizondo's brother, grabbed Junior from behind. At that point, Elizondo got out and started hitting Junior with a gun on Junior's head and forehead. When Elizondo brandished his gun, though, Rigo left running, thinking he was going to be killed. He returned to the club and saw Limon, Sr. approaching the truck with a gun. Rigo said that Limon, Sr. had a gun in one hand and was making a gesture with the other hand as though to calm Elizondo down. He heard Elizondo say, "Get to the ground, son of a bitch. Get to the ground … you dog." According to Rigo, before Limon, Sr. could respond, Elizondo "instantly" fired his weapon. Rigo stated that Elizondo never identified himself as a federal agent that worked for U.S. Customs. Rigo saw Limon, Sr. "walking, like, if he was in pain like it hurt," and then fall down.

## F.    Fermin Limon, Junior

Junior worked for the family business as a bartender. He testified that, on the night of the incident, his wife, who worked at the front counter, informed him that a woman was trying to leave Punto 3 with an alcoholic drink. This woman was later identified as Maria, the defendant's wife. Junior claimed that he grabbed Maria's arm in an effort to stop her from leaving the premises with her drink, as the club would be fined by the Texas Alcoholic Beverage Commission for allowing that. He escorted her to the door and returned to the bar. At that point, his mother asked him to go outside and check on his father, as his father had exited when some patrons had been escorted outside.

Junior saw his father talking to two men and Maria. Maria, according to Junior, was screaming, calling Junior "*pendejo*" and a "dumb ass." Her husband, Elizondo,

8

also called Junior a "*pendejo*." Junior took offense to this, and his father Limon, Sr. told Elizondo not to insult his son. Limon, Sr. pushed his son back because Elizondo was being "aggressive." Junior testified that other employees, including Rigo and Francisco, were now near the commotion. Junior said that one man, either Elizondo or his brother Juan, then hit his father, Limon, Sr. Junior was shocked at this. Next, according to him, Rigo struck the man back with an open hand. After a skirmish, Elizondo began running, and the club employees followed him. Junior heard Elizondo say, "*Van a ver*"[1] while running, and Junior "got scared" because he felt it was "a threat." Junior kept following Elizondo because of this threat.

When Junior arrived at the truck, Elizondo was "inside the truck . . . searching around." Junior began hitting the driver's side window. While banging on the window, he felt someone grab him from behind in a headlock. It was Juan, Elizondo's brother. Then, Junior felt punches from both men. He heard a shot fired and then someone screamed that there was an "officer." After the shot, the men let him go and he ran back to the club. He did not see his father until he crossed the fence. When he saw Limon, Sr. "all bloody on the floor," he became hysterical.

## II. LEGAL SUFFICIENCY

### A. Standard of Review

In conducting a legal sufficiency review, we view the evidence in a light most favorable to the verdict and ask "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garcia v. State*, 367 S.W.3d 684, 686–87 (Tex. Crim. App. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307,

---

[1] Literal translation: "you all will see."

9

319 (1979)).   The trier of fact, in this case the jury, is the sole judge of the credibility of witnesses and the weight, if any, to be given to their testimony.   *Id.*; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.).   "The reviewing court must give deference to the responsibility of the trier of fact to fairly resolve conflict in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."   *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).   In a sufficiency review, "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."   *Id.*   "Each fact need not point directly and independently to the guilty of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."   *Id.*   If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the verdict.   *Garcia*, 367 S.W.3d at 687; *Brooks*, 323 S.W.3d at 899.

We measure the sufficiency of the evidence supporting a conviction "by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).   "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."   *Id.*   A hypothetically correct murder charge in this case would have required the jury to find that Elizondo intentionally caused the death of Limon by shooting him with his gun.   *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

10

## B. Applicable Law

With regard to Elizondo's self-defense argument, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *See id.* § 9.31(a) (West 2011). The actor's belief that the force was immediately necessary is presumed reasonable if the actor knew or had reason to believe that the person against whom the force was used was attempting to commit a felony, like murder in this case. *Id.* § 9.31(a)(1)(C).

The person who is claiming self-defense cannot have provoked the person against whom the force was used. *Id.* § 9.31(a)(2). The Texas Court of Criminal Appeals further elaborated on the doctrine of provocation in *Smith v. State*:

> Provoking the difficulty, as the doctrine of provocation is commonly referred to in our jurisprudence, is a concept in criminal law which acts as a limitation or total bar on a defendant's right to self-defense. The phrase "provoking the difficulty" is a legal term of art, and more accurately translates in modern usage to "provoked the attack." The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.

965 S.W.2d 509, 512 (Tex. Crim. App. 1998). The use of force against another is not justified if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter and the other nevertheless continues or attempts to use unlawful force against the actor. TEX. PENAL CODE ANN. § 9.31(b)(4).

## C. Discussion

By his first issue, Elizondo complains that the evidence was legally insufficient to support the jury's rejection of his self-defense argument. We disagree. A reasonable jury could have believed that Elizondo provoked the fight, which made the self-defense

11

argument unavailable. *See Smith*, 965 S.W.2d at 512. Rigo testified that Elizondo told Junior, "Don't disrespect my woman, you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?" Junior stated that Elizondo called him "*pendejo*" or "dumbass." Then, both Rigo and Junior testified that Elizondo swung, hitting Limon, Sr. Viewing the evidence in the light most favorable to the verdict, we hold that a reasonable jury could have rejected Elizondo's self-defense argument because they believed that he provoked the initial difficulty. *See id.*

Elizondo argues, however, that even assuming he provoked the initial difficulty, he abandoned this first encounter near the bar by running to his pickup truck. This abandonment would thus make him eligible for the self-defense affirmative defense. *See* TEX. PENAL CODE ANN. § 9.31(b)(4) (providing that self-defense is available to a defendant who leaves the altercation but is still pursued). However, we conclude that a reasonable jury could have found otherwise. Junior testified that when Elizondo left the first difficulty and ran to his pickup truck, he was yelling, "*Van a ver*," roughly translated as "You will see." Junior was frightened by that statement and believed it constituted a threat to him and his co-workers. Further, the jury had Elizondo's police statement wherein he admitted that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports the jury's implied finding that Elizondo was running to his truck for his firearm, not to abandon or discontinue the fight.

We overrule Elizondo's first issue.

### III. JURY CHARGE ERROR

In his second issue, Elizondo contends that the jury charge contained error.

12

**A.    Standard of Review**

In analyzing a jury charge issue, or initial inquiry is whether error exists in the charge submitted to the jury.    *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).    If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objection.    *Ngo*, 175 S.W.3d at 743.    If the defendant properly objected to the erroneous jury charge, reversal is required if we find "some harm" to the defendant's rights.    *Id.* (citing *Almanza,* 686 S.W.2d at 171).    If no objection was made, we may only reverse if the record shows egregious harm.    *Id.* at 743–44.    "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Cueva v. State*, 339 S.W.3d 839, 858–59 (Tex. App.—Corpus Christi 2011, pet. ref'd).

**B.    Discussion**

Elizondo argues that the jury charge on self defense was erroneous because it: (1) included a provocation instruction over Elizondo's objection; (2) did not include all of the presumptions of reasonable force as provided by section 9.32 of the penal code; (3) improperly stated the provocation instruction; (4) failed to include an instruction on "threats as justifiable force"; and (5) failed to include any reference to multiple assailants. We address each point in turn.

**1.  Provocation Instruction**

Elizondo asserts that the trial court committed error when it included a provocation instruction to the jury over his objection.    In *Matthews v. State*, the Texas Court of Criminal Appeals held that a provocation charge is proper when:   (1) self

defense is an issue; (2) there are facts in evidence which show that the deceased made the first attack on the defendant; and (3) the defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have a pretext for inflicting injury upon the deceased. 708 S.W.2d 835, 837–38 (Tex. Crim. App. 1986). The determination to include the instruction "is limited to whether there is any evidence raising the issue." *Id.* at 838. "Words alone may provoke the difficulty, thereby justifying a provocation charge." *Id.* (citing *Morrison v. State*, 256 S.W.2d 410 (Tex. Crim. App. 1953)).

Here, there was some evidence to show that Elizondo provoked the fight. Rigo testified that Elizondo told Junior, "Don't disrespect my woman, you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?" Junior stated that Elizondo called him a "*pendejo*" or "dumbass." Then, both Rigo and Junior testified that Elizondo swung, hitting Limon, Sr. These words and actions constituted "some" evidence that Elizondo provoked the first difficulty.

As noted earlier, however, the provocation doctrine is limited if the defendant abandoned the difficulty. *See Smith*, 965 S.W.2d at 513 n.1 (citing TEX. PENAL CODE ANN. § 9.31(b)(4)). Elizondo argues he "abandoned" the encounter by running from the difficulty outside the bar to his pickup truck, nearly seventy yards away. Therefore, he contends that the provocation instruction was improper. To achieve the abandonment caveat to the provocation doctrine, though, it is "necessary that the intention to abandon the difficulty be, in some manner, communicated by the appellant so as 'to advise his adversary that his danger has passed, and make his conduct thereafter the pursuit of vengeance rather than measures to repel the original assault.'" *Ervin v. State*, 367

14

S.W.2d 680, 684 (Tex. Crim. App. 1963); *see also* Tex. Penal Code Ann. § 9.31(b)(4) (providing that abandonment must be "clearly communicated"). Further, "the abandonment of the difficulty by the defendant does not arise where the difficulty was continuous, the only change being in the position of the parties during the progress of the encounter." *Ervin*, 367 S.W.2d at 683–84 (citing *Campbell v. State*, 84 Tex. Crim. 89, 91, 206 S.W. 348 (1918)).

While it is undisputed by all of the witnesses that Elizondo ran nearly seventy yards away from the first difficulty, Junior testified that Elizondo was yelling, "*Van a ver*," roughly translated as "You will see," while running. Junior testified that he believed that Elizondo's words constituted a threat to the others, which made Junior scared. These words did not communicate to Junior that the danger had passed. *See id.* at 684. Further, the jury was presented with Elizondo's statement to the police which provided that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports a rational inference that Elizondo was running to his truck for a weapon, not to escape the fight. *See id.* at 683–84 (providing that one does not abandon a difficulty by merely changing positions). Accordingly, we find that a reasonable jury could have surmised that Elizondo did not abandon the first encounter, and that the provocation instruction was therefore merited.

We conclude that the trial court did not err when it submitted the provocation instruction to the jury because there was sufficient evidence to raise this issue. *Matthews*, 708 S.W.2d at 838. Because we have found no error, no harm analysis is required. *Ngo*, 175 S.W.3d at 743. We overrule this issue.

15

## 2. Presumptions of Reasonable Force

Elizondo also argues that the trial court erred when it failed to include all of the presumptions of reasonable force as provided by section 9.32 of the penal code. TEX. PENAL CODE ANN. § 9.32. The jury charge only provided that a presumption of reasonableness would arise if Elizondo "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder." *Id.* § 9.32(b)(1)(C). Elizondo argues that two additional scenarios should have been added to the charge. First, where the actor knew or had reason to believe an assailant "unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1)(A). And second, where the actor "(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1) (B).

Elizondo complains that he knew or had reason to believe that Junior unlawfully and with force pulled him out of his pickup truck, or was attempting to do so. He stated that Junior's banging on Elizondo's driver's side window yelling "Get off asshole" meant that he was entitled to those instructions.

We agree that the evidence in the record warranted the inclusion of these instructions. Accordingly, we hold that the trial court erred by omitting them. Having found error, though, we do not find any egregious harm.[2] *Ngo*, 175 S.W.3d at 743–44. Because we previously concluded that a reasonable jury could have found that Elizondo was not entitled to a self-defense argument because he provoked the initial difficulty and

---

[2] Elizondo's counsel failed to object to the omissions in this instruction.

16

did not abandon the encounter, *see section III(B)(1) supra*, these extra instructions would not have affected the outcome.   *See* Tex. R. App. P. 44.2.   We overrule this issue.

### 3.   Improper Provocation Instruction

Elizondo also argued that the provocation instruction changed the State's burden of proof by instructing the jury to find Elizondo guilty of murder if he provoked the difficulty.   The charge provided as follows:

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficulty, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's part to produce the occasion for killing the deceased, Fermin Limon, and to bring on the difficulty with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked the defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, if you find there was such design, *then you will find the defendant guilty of murder*.

(Emphasis added).   At trial, Elizondo argued that "the jury should have been instructed, however, that if it found provocation, it should reject self-defense."   We agree and hold that this instruction was erroneous.

Having found error, we turn to a harm analysis.   *Almanza,* 686 S.W.2d at 171. To determine if Elizondo suffered some harm by this incorrect instruction, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."   *Id.*   Upon a thorough review of the trial record and jury charge, though, we find no harm.   From voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that

17

Elizondo committed murder. The jury charge reinforced this tenet. In light of the foregoing, we hold that the error was harmless and overrule this issue.

### 4. Instruction on "Threats as Justifiable Force"

Elizondo also argues that it was error to fail to include an instruction on "threats as justifiable force." Texas Penal Code section 9.04 provides that:

> the threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

TEX. PENAL CODE ANN. § 9.04. It is undisputed, however, that Elizondo did not request this instruction. In *Posey v. State*, the Texas Court of Criminal Appeals held as follows:

> Article 36.14 [of the Texas Code of Criminal Procedure] . . . mandates that a trial court submit a charge setting forth the law "applicable to the case." The question in this case is whether this imposes a duty on trial courts to *sua sponte* instruct the jury on unrequested defensive issues. We hold Article 36.14 imposes no such duty.

966 S.W.2d 57, 62 (Tex. Crim. App. 1998). "Though the evidence might raise a defensive issue, it does not necessarily follow that a trial court has a duty to *sua sponte* instruct the jury on that issue when the defendant does not request such an instruction." *Id.* Elizondo failed to make this request, so we overrule this issue.

### 5. Failure to Include a Multiple Assailant Instruction

Finally, Elizondo asserts that the trial court erred when it failed to include a multiple assailant instruction in the jury charge. The Texas Court of Criminal Appeals "has held that a charge which is confined only to the right of self-defense against the deceased is too restrictive if there is evidence that more than one person attacked the defendant." *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985) (citing

18

*Sanders v. State,* 632 S.W.2d 346 (Tex. Crim. App. 1982)). "Accordingly, a defendant is entitled to a charge on the right of self-defense against multiple assailants if there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant." *Id.* (internal quotations omitted).

Again, however, Elizondo did not ask for this instruction. Although the evidence at trial raised this issue, with various witnesses testifying that Elizondo and his brother Juan fought with at least three Punto 3 employees, the trial court did not have a *sua sponte* duty to include a multiple assailant instruction when it was not requested. *See Posey*, 966 S.W.2d at 62. We overrule this issue.

## IV. CONCLUSION

Having overruled all of Elizondo's issues, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
16th day of January, 2014.