**Floyd Vollien FRANK, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 268–84.**

Court of Criminal Appeals of Texas, En Banc.

May 1, 1985.

---

Joe B. Goodwin (on appeal only), Beaumont, for appellant.

James S. McGrath, Dist. Atty., R.W. Fisher, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty. and Cathleen R. Riedel, Asst. State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant was convicted of murder in a trial before the jury. Punishment was assessed by the jury at 20 years imprisonment. On appeal to the Beaumont Court of Appeals, appellant's conviction was affirmed. *Frank v. State*, (Tex.App.—Beaumont No. 09–83–018 CR, November 9, 1983). We granted the appellant's petition for discretionary review to determine, among other things, whether the court of appeals was correct in holding that appellant was not entitled to a defensive charge on the right to defend himself against a joint attack. We reverse.

Before reaching the merits of appellant's contentions, we first address the State's argument that the error, if any, was not preserved. The record reflects that prior to the delivery of the charge to the jury, appellant filed with the court a document entitled "Defendant's Requested Charges". This two and a half page document contained instructions on the right of self-defense against multiple assailants, instructions on apparent danger, and a paragraph applying both theories to the facts of the instant case.[1] Article 36.15, V.A.C.C.P., specifically provides, in pertinent part:

---

1. Appellant's requested charge essentially follows the one set forth in McClung's Jury Charges for Texas Criminal Practice (1983), page 324, except for one paragraph which deals

"The defendant may, by a special requested instruction, call the trial court's attention to error in the charge, as well as omissions therefrom, and *no other exception or objection to the court's charge shall be necessary to preserve any error* reflected by any special requested instruction which the trial court refuses." (emphasis added).

Although Art. 36.15, supra, clearly holds that the presentation by appellant of his special requested instructions preserves any error from the denial thereof, the State, in its brief, essentially argues that appellant's counsel later waived any error as a result of the following exchange after the closing of the evidence:

"THE COURT: The [State's] objection [to the inclusion of a charge on voluntary manslaughter] is overruled. Do you have any others, Mr. Grove [the prosecutor]?

"MR. GROVE: No, Your Honor.

"THE COURT: Mr. DeLee [appellant's attorney]

"MR. DELEE: Your Honor, I have a written requested Charge I wish the Court to consider.

"THE COURT: All right.

"MR. DELEE: It's similar to the Court's Charge, Your Honor, but not exactly the same.

"THE COURT: The request for the tendered Charge is denied. Anything further, Mr. DeLee?

"MR. DELEE: No, Your Honor."

The State argues that the appellant implied by these statements that his written requested instructions were substantially the same as those given by the trial court and thus by so stating he waived any error. See *DeBolt v. State*, 604 S.W.2d 164 (Tex. Cr.App.1980). We disagree.

■ The trial court had before it the requested written instructions as well as the already prepared court's charge. Appellant's attorney specifically directed the court's attention to the instructions. Even

a quick perusal of the requested instructions clearly shows that although appellant was using similar language in setting out parts of the instructions, his charge substantially differed from the trial court's by the presentation of instructions relative to self defense against an attack by multiple assailants. To agree with the State that appellant waived error would be to hold that the trial judge had no obligation, after being requested to consider a written requested charge presented as similar but not exactly the same as the Court's Charge, to even peruse the instructions after his attention had been specifically directed to them. Such a holding flies in the face of the express and implied intent of Art. 36.15. The State's argument is without merit.

■ In a supplemental brief on the same matter, the State's attorney refers this Court to *Hackbarth v. State*, 617 S.W.2d 944 (Tex.Cr.App.1981), as an analogous situation wherein we held that the objection to the charge was not specific enough to preserve error. The total objection to the charge in *Hackbarth* was as follows: "Fourth. That the defendant objects and excepts to the Court's charge as a whole as the same is not sufficient to protect the rights of the defendant." *Hackbarth*, however, is simply not on point in that the defendant was making an *objection* to the charge, pursuant to Art. 36.14, V.A.C.C.P., not a requested special charge, as provided for in Art. 36.15, supra, and at issue in the instant cause. Moreover, the objection in *Hackbarth*, of course, was totally insufficient to apprise the trial court of the defendant's complaint whereas the appellant in the case at bar properly presented his special requested instructions in writing prior to the court reading the charge to the jury. No other objection was necessary.

Accordingly, we find that any error which occurred from the trial court's denial of the requested instructions was pre-

---

with a V.T.C.A. Penal Code, § 19.06, charge and is the basis for appellant's second ground for review in this Court. Because of our disposi-

tion of appellant's first ground for review, however, we find it unnecessary to address this issue.

served according to the requirements of Art. 36.15, V.A.C.C.P.

We next address appellant's contention that the trial court erred in refusing his special requested instruction on self-defense against a joint attack. The appellant in the instant cause was convicted of the murder of his ex-wife, Goldy Franks. The offense occurred in the front yard of appellant's home when the deceased and her son, Alex Thibo, approached appellant regarding retrieval of a lawn mower which had been awarded to the deceased in the recent divorce decree. According to the testimony of Thibo, appellant shot them without provocation or warning. Thibo was shot twice; his mother was shot three times in the head.

The appellant's testimony as to the circumstances surrounding the shooting differed in several aspects from that of Thibo. He testified that since he and his wife had begun having marital problems, her children, particularly Thibo, had made threats against appellant, had harassed him, and had destroyed his property. He stated he had often called the police as a result of these threats and harrassment. He specifically described several previous threats to his life made by Thibo. He also testified that a few minutes before the instant offense, Thibo had driven by his house, stopped, started "shouting and raving," told appellant he would return with his "stuff," which appellant described as street language for "gun," and drove off. After this threat, appellant went into his house, called the police, picked up his pistol, and returned to the yard to work on the lawn mower. He testified he felt he had to protect himself from Thibo who he claimed often carried a gun and had been in several knife fights. He also testified that his ex-wife sometimes carried a gun and a "long knife" with which "she was saying how she could hide it and walk right up on somebody before they know she's got it." Appellant then described the following sequence of events:

"A. Before I know it, a big red L.T.D. with white top pulled back up. Two people jumped out and ran up to the yard. Before I could even straighten out good, Thibo was on the top step.

\*   \*   \*   \*   \*   \*

"Q. And who was with him?
"A. His mother, Goldie Frank.
"Q. What did you do when they drove up?
"A. I was just finishing up adjusting the back wheels and front wheels to the mower so they could be lifted higher.
"Q. Were you on your knees?
"A. Yes, sir.
"Q. Were you bending over the lawnmower?
"A. Yes, sir, on my knees when they drove up.

\*   \*   \*   \*   \*   \*

"A. ... The gate was open just like it is now, and they ran in. They just come right on in. I hardly had time to stand up.

\*   \*   \*   \*   \*   \*

"Q. Well, what were they saying when they ran in, then, ran through the gate?
"A. He stood on top [of the steps] and said, 'We come to get the lawnmower'.
"Q. Who said that?
"A. Thibo.
"Q. Were you straightened up at that time?
"A. Yes, sir, I was—I said, 'You're going to have trouble getting it'.
"Q. Then what happened?
"A. She got too close to me.
"Q. What do you mean, 'too close to me'?
"A. She got too close to me, and he was moving into me at the same time, and—
"Q. All right. Were you afraid you were going to be hurt then?
"A. Sir, wouldn't you be afraid?
"Q. Were you afraid?
"A. Yes, sir, I was definitely afraid I was going to be hurt.

"Q. What do you mean, 'got too close to me'?

"A. She was right up under me, there, and she could stick anything in my ribs.

"Q. What do you mean by 'right up under you'? You weren't on the step, were you?

"A. No. I was standing down here on the ground. Thibo was standing here at the top step.

"Q. All right.

"A. When she ran in, she ran straight over toward me, like this—and he went to moving in and she ran in there close to me. Well, I figured—I said, '[i]f this is what it is coming to, stop the bad man first', so I shot him first, then I shot down. She didn't move. I thought I missed her. The gun didn't go off. I didn't know. I was excited, I guess, so I just did it a couple of more times, and she finally moved, and he's right up on top of me, like this, so I shot him in the hand. I thought I shot him somewhere else, but it turned out I shot him in the hand. He fell in the bush, then, and took off running.

"Q. All right. You said he was coming at you the second time?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. Were you afraid for your life, Floyd?

"A. Sir, at a time like that, anybody would be afraid for their life, and I was definitely there.

"Q. It's your testimony that they more or less attacked you from the car, they ran at you?

"A. They ran into the yard and got there, and they—looked like they were timing themselves so they could both get me at the same time.

\*    \*    \*    \*    \*    \*

Appellant further testified that after the shooting and before the police arrived, he saw Alex Thibo leaning across a car with a gun pointed at him. He then was asked:

"Q. You don't know if he had a gun [before the shooting], do you?

"A. No, sir, I wouldn't put my neck on the chopping block and say he had a gun, but I believe he had a gun, and I just surprised him. He forgot to use it.

"Q. You were afraid they were going to hurt you or kill you, is that right?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. In your mind, you thought you had to defend yourself that day? Is that right?

"A. Yes, sir. I had to continue to defend myself until help come.

\*    \*    \*    \*    \*    \*

"Q. Now, it's your testimony that you didn't ever see a gun in Alex Thibo's or in Goldie Frank's hand before you shot them, but you thought they might have a gun?

"A. True.

\*    \*    \*    \*    \*    \*

"Q. Now, why did you feel in your mind that this was the time that they were actually going to inflict bodily injury on you?

"A. Sir, you have to live in my community and walk the block, or be with the people who do walk the block, to know what I'm talking about. People like Felix, her oldest son that was here already, Thibo, and the others, they are dangerous people.

"Q. What do you mean by being 'dangerous people'?

"A. They have cut up quite a few people, and they have got into it, and they have quick, very quick tempers.

"Q. So, I ask you, again, were you afraid at that time?

"A. Yes, sir. I was afraid for my life."

In the instant case, the trial court gave an instruction on the law of self-defense against an attack by the deceased, but refused the requested instruction on self-defense against a joint attack. The State, in its brief on direct appeal, argued that there

was no evidence showing that the third person, i.e., Thibo, had a weapon or made a move as if to draw a weapon, and thus no charge on a joint attack was necessary. The court of appeals, however, found:

> "The only threat appellant testified to regarding his ex-wife (the deceased) was that she got too close to him. This hardly justified his shooting her three times in the head; therefore, even if appellant's fears concerning deceased's son were justified, an attack by multiple assailants was not raised by the evidence."

Thus, the court of appeals found that the trial court had incorrectly given a charge on the appellant's right to defend himself against an attack by the deceased. The court then concluded that a charge on the right to defend against an attack by the deceased *and* a third party was certainly not required.

■ The law of self-defense by the use of deadly force has long been codified in Texas. A person is justified in using deadly force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force if a reasonable person in the actor's situation would not have retreated. V.T.C.A. Penal Code, §§ 9.31, 9.32. Furthermore, this Court has held that a charge which is confined only to the right of self-defense against the deceased is too restrictive if there is evidence that more than one person attacked the defendant. *Sanders v. State,* 632 S.W.2d 346 (Tex.Cr.App.1982). Accordingly, a defendant is entitled to a charge on the right of self-defense against multiple assailants if "there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant." *Wilson v. State,* 140 Tex.Crim 424, 145 S.W.2d 890, 893 (1940). In determining whether evidence has been presented which raises the issue of a defensive charge, we must consider *all* of the evidence presented at trial regardless of whether it is "strong, weak, unimpeached, or contradicted." *Booth v. State,* 679 S.W.2d 498, 500 (Tex.

Cr.App.1984). See also *Lugo v. State,* 667 S.W.2d 144 (Tex.Cr.App.1984).

■ Although the court of appeals and the trial court differed as to which of the injured parties may have been attacking appellant according to appellant's trial testimony, we find appellant's testimony clearly demonstrated that he believed *both* were about to attack him. He testified the deceased sometimes carried a knife. He further testified that on the day of the offense the deceased ran into the yard and up to him as if she were positioning herself to "stick" him in his ribs. Moreover, appellant's testimony was replete with evidence of his belief that Thibo had a gun and, along with the deceased, was attempting to make a deadly assault upon appellant. Although the trial court by its charge acknowledged appellant's testimony regarding the attack by the deceased, the trial court refused the requested instruction on the right of self-defense against multiple assailants. Appellant requested such a charge and the denial of same was reversible error. See *Sanders,* supra; *Warren v. State,* 565 S.W.2d 931 (Tex.Cr.App.1978).

The judgments of the court of appeals and the trial court are reversed and the cause is remanded to the trial court.