NUMBER 13-00-134-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

___________________________________________________________________

ELPIDIO SALAZAR ROMERO , Appellant,


v.



THE STATE OF TEXAS , Appellee.

___________________________________________________________________

On appeal from the 370th District Court

of Hidalgo County, Texas.

__________________________________________________________________

O P I N I O N

Before Chief Justice Valdez and Justices Yañez and Castillo

Opinion by Justice Castillo


Elpidio Salazar Romero, appellant, was convicted by a jury of the offense of murder and sentenced to forty years in
prison.(1) From this conviction he appeals, raising three points of error. We reverse and remand for a new trial.

Factual Background

On October 17, 1998, appellant was awakened by his pregnant wife who asked him to take her to a convenience store to
purchase some cupcakes. Before leaving his parents' house, where he and his family were then residing, appellant took his
father's loaded handgun from a top cabinet because he was worried for his safety due to the neighborhood he lived in and
the enemies he had there. He placed the gun on top of the back seat of his sister's vehicle, which he was borrowing for the
errand. Appellant, his wife, and his two-year-old daughter then went to the store. On the way home after making the
purchase, Romero stopped at his neighbor Floyd Garcia's home to inquire about a debt that Floyd owed him. While there,
Romero honked the vehicle's horn. Victor Garcia, Floyd's father, responded from inside the property's fence that Floyd was
not in.

According to appellant, he began to leave but then noticed someone motioning him to stop and come back. Thinking that
the person was Floyd, appellant stopped and reversed his vehicle, only to discover that it was Victor Garcia. Garcia
appeared "crazy or high or something" and was advancing on the car and yelling, "I already got tired of you. You have worn
my patience. You better grab your nuts because when I see you around I am going to kill you." (2) Appellant told Garcia to
ignore him because he was with his family and did not want any problem, but Garcia advanced further toward the vehicle.
Appellant then pushed Garcia away with the car door and reached for his gun, which he pointed at Garcia while telling him
to get away. Out of the corner of his eye, appellant saw an unknown person (3) rapidly approaching the vehicle. The man
came at him from the side and attacked him. Appellant testified that "they" tried to take the gun away and he kicked
"them" two or three times to get them out of his way. (4) "He" had wanted to take the gun away and had been on top of
appellant. Romero claimed that he feared for his life and that of his family. Appellant's finger "started moving real fast"
and he "heard a shot" and then "didn't feel him" any more. Romero's wife got out of the car with their daughter and ran
home. Romero "just wanted to leave" and he walked rapidly home. 

When he arrived at his parents' house, he told his father what had happened and where he had left the gun, and told his
sister to call 9-1-1. When she asked him if he had shot someone, he replied, "I don't know. I don't know if I shot someone."
When the police arrived, appellant turned himself in. In route to the station, he told the officer that he had been attacked by
someone but had not known whom. He later told another officer that he had feared the victim and Garcia were going to
hurt him; the victim had come from the opposite side of where Garcia was and he believed the victim was going to hurt
him; that he had felt that they were going to get him; and that Garcia and the victim had attacked him. (5) He also gave a
written statement, admitted at trial, in which he claimed the victim had come at him from the side and he had gotten scared,
pointed the gun towards the direction of the man, and shot some rounds.

By contrast, Victor Garcia testified that appellant had gone by Garcia's house three times that day looking for Floyd, and on
the final and fatal occasion, appellant had been angry and started cursing. They began arguing and as the argument got
louder, Iturrubiate came towards them and asked "What is going on?" Appellant replied, "Do you also want to mess with
me?," pulled out a gun, leaned over and fired at least four shots at Iturrubiate. He then pointed the gun at Garcia and fired
but the gun jammed and he complained, "I am tired that y'all keep messing with me." Garcia went to help his brother, and
when he later looked up, appellant and his wife had both taken off running to their home. Garcia denied that there was any
struggle between appellant and himself or his brother and did not recall being pushed by the car door. 

The only other witnesses present at the time of the shooting who testified at trial were Leslie Ann Romero, appellant's wife,
Sonia Alvarado, Victor Garcia's wife and Vianey Mercardo, appellant's sister. Mrs. Romero testified that Victor Garcia had
told her husband "to grab his nuts" because he (Garcia) was going to kill him and he "had people and they were going to
kill his [Romero's] whole family." Mrs. Romero also stated that someone else came over and three times "got in" the
conversation. She also saw her husband struggling with someone whom she could not identify. According to Mrs. Romero,
"they attacked him," went in the car and "jumped on him." She later stated that the "other guy just came at him" and that
her husband grabbed "some other man's arms" and another man grabbed her husband's arms but she did not know who the
person was.

Sonia Alvarado testified that her husband, Victor Garcia, had gone over to where appellant was. Appellant remained in the
car. She thought they were arguing based on Garcia's hand motions. Iturrubiate had been sitting by her and had asked who
the person was. After she told him that he was their neighbor, Iturrubiate had gotten up, gone to a nearby blue car, sat
inside and lit a cigarette, and had then gone over to where Garcia was. Alvarado saw Iturrubiate standing next to Garcia
but then looked away. She did not look back again until she heard the shots, at which time she saw her husband standing
and appellant with a gun, aiming at Garcia and saying, "They wanted to mess with us." (6) She then turned away and she did
not see where appellant went. She asked her husband where Iturrubiate was and Garcia responded, "This bastard killed
him."

Vianey Mercado saw two men next to her brother's car and thought Victor Garcia was arguing with appellant because of
Garcia's hand gestures. She then saw "them attacking towards the car," then saw the fire of a gun. According to Mercado,
her brother then got out of the car and walked quickly back to the house. He looked scared and told her, "they came at me."
She went with him to the police station and recalled at trial that he had told the police that he had been defending himself
because he had been attacked.

Denial of Instruction on Self-Defense against Multiple Assailants

In his third point of error, appellant argues that the trial court erred in refusing to submit a requested instruction of a
defensive issue of self-defense against multiple assailants. Appellant properly presented a written instruction to the court
on this issue pursuant to the requirements of code of criminal procedure article 36.15. Tex. Code Crim. Proc. Ann. art.
36.15 (Vernon Supp. 2001). Therefore, any error related to the refusal to give the charge at issue has been preserved. See
Vasquez v. State, 919 S.W.2d 433,435 (Tex. Crim. App. 1996).

When properly requested by the defendant, the trial court must instruct the jury on every defensive issue raised by the
evidence, regardless of whether that evidence " is strong, feeble, unimpeached, or contradicted" and even if the trial court
believes the evidence not to be credible. Dyson v. State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984) (quoting Warren v.
State, 565 S.W.2d 931, 933 (Tex. Crim. App. 1978)). To be entitled to an instruction on self-defense against multiple
assailants, there must be evidence that the defendant was in danger of an unlawful attack or threatened attack from multiple
assailants, as viewed from the standpoint of the defendant. Frank v. State, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985). 

When there is evidence that a defendant has been attacked by multiple assailants, he has the right to a charge on
self-defense as it relates to multiple assailants. Hinojosa v. State, 744 S.W.2d 319, 321 (Tex. App. - Corpus Christi 1988,
pet. ref'd). A charge which is confined to the right of self-defense against the victim is too restrictive if there is evidence
that more than one person attacked the defendant. Sanders v. State, 632 S.W.2d 346, 348 (Tex. Crim. App.
1982)(quotingMcCuin v. State, 505 S.W.2d 831, 832 (Tex. Crim. App. 1974)). Moreover,"the unlawful deadly force
against which the defendant may protect himself need not have been manifested by the victim." Henderson v. State, 906
S.W.2d 589, 596 (Tex. App. - El Paso 1995, pet. ref'd). Thus, in the case of multiple assailants, the jury should be
instructed that a defendant has a right to act in self-defense if he was in fear of death or serious bodily injury from the
victim or another assailant. Brown v. State, 651 S.W.2d 782, 784 (Tex. Crim. App. 1983).

In the present case, considering the testimony of appellant, his wife, and his sister, as well as the redacted police report
admitted in trial which reflected his oral statements to the police when he was at the station, we find that there was
evidence presented at trial that appellant was under attack by both the victim and Garcia and also that appellant believed
himself to be under attack or threat of attack at the hands of both men. (7) Accordingly, the trial court erred in failing to give
the requested instruction on self-defense against multiple assailants.

We next consider whether there is evidence of "some harm" suffered by appellant as a result of this charging error.
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)(op. on reh'g). The presence of any harm, regardless of
degree, resulting from preserved charge error, is sufficient to require a reversal. Hinojosa, 744 S.W.2d at 322 (citing Arline
v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986)). Conversely put, where charge error has been properly preserved, a
conviction must be reversed unless the error is harmless. Almanza, 686 S.W.2d at 171. In considering whether the error
was harmless, we review the entire jury charge, the state of the evidence, the argument of counsel and any other relevant
information in the record. Id.

The charge in the present case only permitted the jury to consider the actions of the victim, Iturrubiate. (8) Since we presume
that the jury followed the jury instructions, we must presume that they only considered the actions of Iturrubiate, and not
those of Victor Garcia. See Kemph v. State, 12 S.W.3d 530, 533 (Tex. App. - San Antonio 1999, pet. ref'd) (where jury
instruction only referred to one police officer but the evidence showed that six officers were involved, the court presumed
that the jury only considered the actions of the one named officer and found "some harm" in a failure to instruct on multiple
assailants); Lerma v. State, 807 S.W.2d 599,601-02 (Tex. App. - Houston [14th] 1991, pet. ref'd)(where record contained
evidence of two assailants, the jury should have been allowed to consider the defendant's actions "in the light of the threat
he perceived from both"). Moreover we cannot say what the effect would have been had the jury been instructed that they
might consider the acts of both men as to the issue of self-defense and the question of real or apparent danger. Considering
that this question went to the very heart of this case, was hotly contested, and appellant's theory was supported by the
testimony of two other witnesses, we cannot say the error is harmless. See Kemph, 12 S.W.3d at 533; Alaniz v. State, 865
S.W.2d 529, 533 (Tex. App. - Corpus Christi 1993, no pet.). We find that appellant suffered "some harm" and therefore
sustain appellant's third issue.

Conclusion

Having sustained appellant's third issue, we do not reach the remaining issues.See Tex. R. App. P. 47.1. We reverse
appellant's conviction and remand this cause for a new trial. 

ERRLINDA CASTILLO

Justice

Do not publish .

Tex. R. App. P. 47.3.



Opinion delivered and filed

this 6th day of December, 2001.

1. Tex. Pen. Code Ann. §19.02 (Vernon 1994).

2. All exchanges between Garcia, appellant and the victim were in Spanish and translated at trial into English. 

3. He was later identified as Eluid Iturrubiate, Victor Garcia's brother. Iturrubiate suffered three gunshot wounds and died
of his injuries.

4. Appellant never specifically clarified to whom the pronouns "he" and "him" referred. In

later testimony, appellant indicated that one man had come at him and he had pushed the man away and the other man had
gotten on top of him and was trying to get the gun away from him and that was the man he kicked, again without specifying
either man as Victor Garcia or Eluid Iturrubiate. 

5. These statements were testified to by Officer Clemente Blanco and a redacted police report containing such statements
was admitted into evidence.

6. It is unclear what the witness actually stated as there were several protests over the

translation which was variously rendered by the bailiff, the judge and the prosecutor. Versions included "They wanted to
beat us," "They wanted to mess with us," " ... wanted to mess with me,""He wanted to mess - wanted to" before the
prosecutor gave up and said, "All right." The original Spanish statement does not appear in the record. 

7. The State cites Jones v. State, 963 S.W.2d 177 (Tex. App. - Fort Worth 1998, pet. 

ref'd), in support of its argument that the issue of defense against multiple assailants was not raised by the evidence in the
present case, arguing that the facts in the two cases are analogous. We find Jonesinapposite. While there is a similarity
between the two cases when only the State's evidence is considered, there are substantial differences between the two cases
when the instant case is viewedfrom the standpoint of the defendant as required. See Frank v. State, 688 S.W.2d 863, 868
(Tex. Crim. App. 1985).

8. The relevant portions of the instructions were as follows:



"You are further instructed that, in determining the existence of real or apparent danger, it is your duty to consider all of the
facts and circumstances in evidence in the case before you and consider the words, acts, and conduct if any, of ELUID
ITURRUBIATE, at the time of and prior to the time of the alleged killing, if any, and in considering such circumstances,
you should place yourselves in defendant's position at that time and view them from his standpoint alone.



Now if you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, ELPIDIO
SALAZAR ROMERO, did shoot ELUID ITURRUBIATE with a firearm as alleged, but you further find from the evidence
that: 



1. viewed from the standpoint of the defendant at the time, from words or conduct, or both of ELUID ITURRUBIATE, it
reasonably appeared to the defendant that his life or person was in danger; 



2. there created in the mind of the defendant a reasonable expectation or fear of death or serious bodily injury from the use
or attempted use of unlawful deadly force at the hands of ELUID ITURRUBIATE, if any; and



3. that acting under such apprehension, he reasonably believed that the use of force or deadly force on his part was
immediately necessary to protect himself against ELUID ITURRUBIATE'S use or attempted use of unlawful deadly force,
he shot the said ELIUD ITURRUBIATE; and



4. that a reasonable person in defendant's situation at the time would not have retreated; 



then you should acquit the defendant on the grounds of self-defense ...."



The converse of the charge was also given, with similar limitations to the consideration of the actions only of Eluid
Iturrubiate.