Opinion by Justice Moseley
A Bowie County jury convicted Patrick Jordan of discharging a firearm in a manner *175 that constituted deadly conduct, a third degree felony. See TEX. PENAL CODE ANN. § 22.05 (West 2011). Jordan was sentenced to four years' imprisonment.
On appeal, Jordan argues that the trial court erred in (1) denying his request to instruct the jury that it was required to acquit him if it had reasonable doubt as to whether the State disproved his justification of self-defense, (2) denying his request to include an instruction that his belief that deadly force was immediately necessary was presumed reasonable if he knew or had reason to believe that the victim or others were committing or attempting to commit murder or serious bodily injury, (3) excluding multiple assailant language in the jury charge, (4) including a duty to retreat in its instructions on self-defense, (5) excluding evidence of the first aggressor's reputation, and (6) excluding evidence of Jordan's good reputation for honesty.
We overrule Jordan's first four points of error after concluding that he was not entitled to an instruction on self-defense. We further find that Jordan failed to preserve his fifth point of error and that no harm resulted from the trial court's exclusion of testimony regarding Jordan's reputation for honesty. Accordingly, we affirm the trial court's judgment.
I. Factual and Procedural History
The shooting involved in this case occurred in the parking lot of the Silver Star Smokehouse & Saloon in Texarkana, Texas. The evidence at trial demonstrated that Jordan and his friend, Cody Lynn Bryan, stopped at the restaurant for dinner after packing up Jordan's belongings in preparation for his move to Broken Bow, Oklahoma. Before arriving, Jordan sent a text message to his ex-girlfriend, Summer Varley, to see if she was working at Silver Star and to seek her permission to eat there. Varley, a waitress at the establishment, responded that she was at the restaurant, but was not currently working a shift. She granted Jordan permission to patronize the restaurant and buy her a drink.
Marissa Jones was waitressing at the restaurant and recalled that Varley had been at the bar drinking with friends Jordan Royal, Austin Blake Crumpton, Damon Prichard, and Joshua Stevenson. Varley testified that Royal was like a brother to her and that she had discussed with Royal the complicated nature of her relationship with Jordan. According to Varley, Royal was intoxicated and upset at Jordan's treatment of her during their relationship. Royal testified that Varley informed him of an altercation that she had with Jordan, causing him concern for Varley's well-being.
Jordan and Bryan testified that they were met by Royal at the entryway of the establishment. According to the five-foot-five Jordan, the over-six-foot Royal, a member of the Arkansas Army National Guard, "squeezed [his] hand pretty intently." Matt Cashatt, a detective with the Texarkana, Texas, Police Department (TTPD), testified that Royal instructed Jordan not to speak with Varley. Jordan said he told Royal that he was only there to eat, not to talk to Varley. Jordan and Bryan obtained a table in the main section of the restaurant, away from the bar, and ordered burgers and beers.
While they were waiting on their food to arrive, Jordan and Bryan were visited by Varley and Prichard. According to Cashatt, Varley told Jordan "that he couldn't be an asshole to her and come up there and not expect for someone to say anything to him about it." Next, Prichard approached Jordan and asked him if he liked to hit women, prompting a response from Jordan that he did not know what Prichard was talking about. At trial, Prichard testified *176 that Bryan slapped him in the chest twice at the table after his conversation with Jordan and that, as a result, he instructed Bryan and Jordan to meet him outside. Bryan and Jordan both denied any physical altercation with Prichard, whom they described as having "a pretty aggressive nature." Their testimony appeared corroborated by Vince Minter, who was eating dinner with his wife at a table near Jordan and Bryan. Minter said that he saw Prichard approach Jordan and Bryan to exchange words. According to Minter, Jordan and Bryan were very quiet and were not involved in any confrontation with Prichard while in the restaurant.
Soon thereafter, Prichard, Royal, Stevenson, Crumpton, and Varley paid their tabs at the bar and walked outside, gathering near the front entrance. Varley testified that the rest of the group was upset and that she was telling everyone to calm down and mind their own business. A surveillance video recording of the front entrance showed Varley appearing to argue with the group. Meanwhile, Jordan testified that he and Bryan decided to cancel their food order to avoid confrontation. They waited ten or fifteen minutes, "[l]ong enough for [the group] to disperse from the parking lot," before exiting the business.
The surveillance recording depicted Jordan and Bryan exiting several feet to Varley's right while Royal and his group were standing several feet to Varley's left. Cashatt testified that according to Varley, Jordan said he did not mean to cause any problems and immediately attempted to leave with Bryan walking behind him.[1] Varley said she told Jordan to leave because she was aware of an impending attack by Royal and feared for Jordan's safety. Bryan testified that he and Jordan walked speedily toward Bryan's car because Royal, Prichard, Stevenson, and Crumpton (collectively referred to as Royal's group) were all intoxicated and "hollering a little bit, kind of moving around." According to the recording and analysis of the same by Greg Walker, a Sergeant at the TTPD, "it appear[ed] that [Royal's] group was outside, and when Bryan and Patrick Jordan exit [the restaurant] straight out to the parking lot, the group quickly follows." Varley sped behind Royal's group, who appeared to be chasing after Jordan and Bryan as they attempted to leave. Screaming, she tried in vain to get Royal's group to leave Jordan alone. Consistent with Varley's testimony, Cashatt testified that Varley reported chasing after Royal because he was drunk and angry, and she knew Royal would "tear into [Jordan]."
There was no surveillance recording of the parking lot, allowing for two versions of the incident. According to the version of events from Varley, Jordan, and Bryan, Royal hit Bryan with such force that it knocked Bryan completely unconscious. The evidence at trial showed that Bryan was hospitalized and treated for a fractured eye socket and nose sustained from one punch lobbed by Royal.[2] Bryan testified that he did not see the remaining altercation because he woke up in an ambulance. Cashatt recalled that Varley told him Royal became fired up and swung at Bryan, who did not provoke Royal. According to the second version of events from Royal and Crumpton, Bryan slapped Royal before Royal knocked him out cold.
*177 Jordan testified that he turned around when he heard the punch, saw Bryan on the ground, and watched Royal signal for Stevenson to chase Jordan. Jordan tried to run to the car when Royal "reached around [his] face, fish-hooked [his] eye, and turned [him] around." Jordan testified that Royal "lock[ed him] up" and got on top of him. According to Cashatt, Crumpton reported that Stevenson and Royal "were into it with" Jordan and that they "tussled." Although Varley said at trial that she did not see Royal physically touch Jordan, Cashatt testified, "She said she tried to pull [Royal] off [Jordan] but then her arm went numb and she fell down." She had been shot. The gunfire prompted Royal to run in between cars parked in the lot, with Crumpton running behind him. Jordan fired another bullet that pierced Royal in the femoral artery. Royal testified that he fled the scene with Stephenson, who took him to the hospital. Likewise, Crumpton and Prichard also separately fled the scene.
At trial, Jordan admitted that he had pulled out a loaded pistol from his pocket during the altercation. Jordan explained that Royal had an intimidating physique. After he saw what happened to Bryan, Jordan testified that he feared for his safety, believed he was getting mobbed, and felt that he had no alternative but to pull the trigger even though he could not see to aim the weapon. Varley believed that it was reasonable for Jordan to fear for his safety since multiple assailants were attacking him and because she, too, feared for his safety. Although it was undisputed that no one in Royal's group was carrying a weapon, Cashatt testified that it was possible that Jordan thought Royal was a threat to his safety and welfare. Cashatt "recall[ed] Mr. Jordan telling [him] that he was going to his car when he felt somebody grab him from behind." Cashatt also said he noticed Jordan's eyes were bloodshot after Jordan reported that someone had scraped over his eyes during the altercation.
Anna Coleman, who had just arrived at the restaurant, testified that she witnessed the commotion in the parking lot. Coleman said, "[T]hey were sort of in a circle out there, and all of a sudden the circle started getting very active. A lot of arms flying, pushing, a lot of commotion." She heard a gunshot and remained in the car until the shooting was over. After the shooting, she saw Varley and Bryan on the ground. Coleman testified that Jordan was standing in the parking lot, "out there all alone," and that "everybody else was over where the commotion had gone on."
After the shooting, Jordan testified that he walked back inside to tell the staff to dial 9-1-1. The surveillance recording from inside the restaurant showed that Jordan reentered the restaurant, walked to the kitchen, spoke to staff as he laid his pistol on the counter, held his hands up, and waited for police. Joseph Tefteller, a police officer with the TTPD, testified that a Silver Star employee led him to Jordan, who immediately pointed to a pistol on the counter, put his hands up, and said, "Here I am." Jordan was arrested and soon confirmed with TTPD that he had discharged the firearm.
Varley, who had been shot in the chest, was transported to the hospital for emergency treatment while TTPD was processing the scene. The next day, she sent Jordan the following text message:
I didn't want this to happen to you. I never wanted any of this. I feel like the guiltiest person and you put me in a bad situation because you're the one who pulled out a gun. You could've killed me and [Royal]. I tried to protect you, and you shot me.
*178 As a result of the Silver Star shooting, Jordan was jointly tried for (1) aggravated assault with a deadly weapon against Royal and (2) deadly conduct against Varley and Crumpton. Jordan asserted self-defense as justification for his actions. In spite of a lengthy deliberation, the jury was unable to reach a verdict on the aggravated assault charge. The trial court declared a mistrial as a result of the hung jury on that charge. However, the jury found Jordan guilty of deadly conduct after concluding that he knowingly discharged a firearm in Varley and Crumpton's direction. See TEX. PENAL CODE ANN. § 22.05(b)(1) (West 2011). Jordan appeals.
II. Jordan Was Not Entitled to a Self-Defense Instruction
Jordan was indicted for deadly conduct committed against Varley and Crumpton. Jordan made a request for a jury charge that included instructions pertaining to self-defense. The fact that Jordan was simultaneously tried for two charges arising from the same incident (i.e., the aggravated assault of Royal and the dangerous conduct directed toward Varley and Crumpton) may have raised confusion as to the content of the charge. In Jordan's written request, it may be construed that Jordan was requesting a self-defense instruction only as to the charge against him for the alleged aggravated assault of Royal but not pertaining to the dangerous conduct charge. From the exchange at the charge conference, it appears that the trial court believed Jordan to be requesting a self-defense instruction as pertained to the deadly conduct charge. The trial court generally instructed the jury as follows:
A person is justified in using deadly force ... when he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force, and if a reasonable person in defendant's situation would not have retreated.
....
A person is justified in using force or deadly force against another to protect a third person if: 1) under the circumstances the actor reasonably believes them to be, the actor would be justified, as in self-defense, in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and 2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.
The application paragraph of the trial court's charge stated:
Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, PATRICK JORDAN, did commit the offense of deadly conduct, as alleged in the indictment, but you further find from the evidence, as viewed from the standpoint of the defendant at the time that from the words or conduct, or both, of Jordan Royal it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Jordan Royal, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against Jordan Royal's use or attempted use of unlawful deadly force, he shot Jordan Royal with a gun, and that a reasonable person in the defendant's situation would not have retreated, then you should acquit the defendant on the grounds of self-defense on said occasion and under the circumstances, *179 then you should give the defendant the benefit of that doubt and say by your verdict of not guilty of Deadly Conduct.
If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that a reasonable person in the defendant's situation at the time and place in question would have retreated before using deadly force against Jordan Royal, or that the defendant, under the circumstances as viewed from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Jordan Royal's use or attempted use of unlawful deadly force, then you should find against the defendant on the issue of self-defense.
Jordan alleges that the jury charge erroneously included a duty to retreat.[3] Jordan also argues that the trial court erred in (1) denying his request to instruct the jury that it was required to acquit him if it had reasonable doubt as to whether the State disproved his justification of self-defense, (2) denying his request to include an instruction that his belief that deadly force was immediately necessary was presumed reasonable if he knew or had reason to believe that the victim or others were committing or attempting to commit murder or serious bodily injury, and (3) excluding multiple assailant language in the jury charge.
"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). "A person is justified in using deadly force against another ... when and to the degree the actor reasonably believes the deadly force is immediately necessary ... to protect the actor against the other's use or attempted use of unlawful deadly force," if the actor's actions would be justified under Section 9.31 of the Texas Penal Code. TEX. PENAL CODE ANN. § 9.32(a) (West 2011).
"[A] defense is supported (or 'raised') by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." Shaw v. State , 243 S.W.3d 647, 657 (Tex. Crim. App. 2007). "If a defense is supported by the evidence, then the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible." Id. at 658. However, "if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue." Ferrel v. State , 55 S.W.3d 586, 591 (Tex. Crim. App. 2001).
"In [the] absence of evidence of use or attempted use of deadly force by [the victim], the statutory defense permitted by [Section] 9.32 is not available, and a defendant is not entitled to a jury instruction" on self-defense. Werner v. State , 711 S.W.2d 639, 644 (Tex. Crim. App. 1986) ; see Holmes v. State , 830 S.W.2d 263, 265 (Tex. App.-Texarkana 1992, no pet.) ; see also Gamino v. State , 537 S.W.3d 507, 512 (Tex. Crim. App. 2017) ("Appellant was entitled to receive a self defense instruction if there had been some evidence, even if contradicted, that he believed the display of his gun was immediately necessary to *180 protect himself against the victim's use or attempted use of unlawful force.").
Jordan's self-defense theory was based on the argument that he was justified in using deadly force against Royal because Royal's fist constituted a deadly weapon. Royal was not the victim in the deadly conduct charge. Rather, the jury was charged with deciding whether Jordan committed deadly conduct against Varley or Crumpton. The evidence at trial established that Varley was not an attacker and instead sought to protect Jordan. Likewise, Crumpton testified he was not involved in the fight at all and did not kick or punch anyone. Crumpton's testimony was not challenged, and nothing suggested that Crumpton used deadly force against Jordan. Accordingly, we find that Jordan was not entitled to an instruction justifying his use of deadly force against Varley and Crumpton. Consequently, we overrule Jordan's first four points of error, concluding that Jordan was not entitled to an instruction on self-defense with respect to the deadly conduct charge.[4]
III. Jordan Failed to Preserve His Fifth Point of Error
During Jordan's direct testimony, counsel asked Jordan what happened as he approached Silver Star, to which Jordan replied, "When I approached the restaurant, there was a guy that I had previously known from work. His reputation proceeds [sic] him everywhere, but he confronted me-" The State objected, prompting Jordan's attorney to instruct Jordan to "[j]ust answer the question." The State requested a bench conference in which the trial court admonished Jordan to refrain from rambling and instructed Jordan to answer only the question asked. Then, the following discussion transpired after the jury was excused:
[BY THE STATE]: Your Honor, the State's objection as it relates to the motion in limine that the State submitted to this Court as it relates to the reputation and so forth as it relates to the victim in this case, and it's clear to this Court that the victim has no prior felony convictions. It is improper to place in front of the jury a reputation response that this witness was submitting, and it places the jury in the state of mind that this victim has done something in the past, and therefore the Defendant would have some reason to do what he did that night.
THE COURT: That is sustained.... [D]id you advise your client of the motion in limine that this Court granted?[5 ]
[BY THE DEFENSE]: I don't recall that I specifically went through it.
THE COURT: As an officer of the Court, did you not tell your client what our motions are and my rulings?
[BY THE DEFENSE]: No, sir, I did not.
THE COURT: All right. I'll carry this forward. You ask the questions, and you answer the questions. We're not rambling. We're not deviating from my prior rulings. Is everybody crystal clear on this?
[BY THE DEFENSE]: Yes, Your Honor.
THE COURT: Everybody good?
[BY THE STATE]: Absolutely.
THE COURT: Crystal?
*181 WITNESS: Yes, sir.
THE COURT: All right. Bring them back in.
"A party may claim error in a ruling to ... exclude evidence only if the error affects a substantial right of the party and ... a party informs the court of its substance by an offer or proof, unless the substance was apparent from the context." TEX. R. EVID. 103(a)(2). On appeal, Jordan argues that the trial court erred in disallowing testimony of "Royal's bad reputation for getting into fights and seriously injuring others." However, aside from stating that Royal's reputation preceded him, Jordan did not testify about what Royal's reputation was. Because Jordan failed to make an offer of proof, nothing established that Royal had been in a fight before the Silver Star incident, much less that he had a bad reputation for getting into fights and seriously injuring others. Additionally, we cannot conclude that the trial court must have understood that Jordan sought to establish Royal's reputation for fighting and injuring others from the context of the dialogue referenced above.
Accordingly, Jordan cannot now complain that the trial court erred in disallowing evidence that it never considered. See Fahrni v. State , 473 S.W.3d 486, 500 (Tex. App.-Texarkana 2015, pet. ref'd).[6] We overrule Jordan's fifth point of error.
IV. Jordan Was Not Harmed by the Exclusion of Evidence of His Reputation for Honesty
Next, citing to Rule 608 of the Texas Rules of Evidence, Jordan also argues that the trial court erred in excluding evidence of his reputation for truth and veracity after the State allegedly attacked his character for truthfulness during his cross-examination. See TEX. R. EVID. 608. During Bryan's direct examination, Bryan was asked, "Are you familiar with the reputation in the community of Patrick Jordan for being honest?" Bryan answered, "Yes, sir." The State objected and requested a bench conference. During the bench conference, the State argued that counsel's question was improper during the guilt/innocence phase of the trial. The trial court said, "In the guilt/innocence phase, it is. If we were in punishment, it would be different." Jordan's counsel responded, "Okay," and the direct examination resumed.
Even assuming error, without deciding the matter, we cannot conclude that Jordan was harmed by the exclusion of evidence regarding his reputation for honesty. At trial, Jordan admitted that he discharged the firearm and asserted the justification of self-defense. Jordan argues that he was harmed by the exclusion of Bryan's testimony regarding his honesty because it impaired his justification defense. Because we have determined that Jordan was not entitled to an instruction on self-defense where the evidence demonstrated that Varley and Crumpton did not use or attempt to use deadly force against him, we conclude that he was not harmed by the trial court's exclusion of evidence regarding his reputation for honesty. We overrule Jordan's last point of error.
V. Conclusion
We affirm the trial court's judgment.
DISSENTING OPINION ON MOTION FOR REHEARING
Ralph K. Burgess, Justice
In his motion for rehearing, Jordan argues that he was entitled to an instruction *182 allowing the jury to find that his use of deadly force was justified by Section 9.32 of the Texas Penal Code. The majority overrules Jordan's motion for rehearing without a written opinion. While I do not know whether, on rehearing, we would reach a different result than we reached in our opinion, I believe that the motion for rehearing raises several novel issues worthy of review.
In order for Jordan to avail himself of the availability of a defense, he was required to present some evidence "on each element of the defense." Shaw v. State , 243 S.W.3d 647, 657 (Tex. Crim. App. 2007). Under Section 9.32,
A person is justified in using deadly force against another:
(1) if the actor would be justified in using force against the other under Section 9.31 ; and
(2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
(A) to protect the actor against the other's use or attempted use of unlawful deadly force....
TEX. PENAL CODE ANN. § 9.32(a) (West 2011).
Our opinion concludes that Jordan was not entitled to an instruction that his use of deadly force was justified because Royal, who was not the victim, was the only one who used deadly force. Additionally, there was no evidence that either Varley or Crumpton used or attempted to use unlawful deadly force. Thus, in the absence of such evidence, we concluded that there was no evidence from which a rational jury could find that Jordan reasonably believed that the degree of deadly force he used was immediately necessary to protect himself against Varley or Crumpton's use of deadly force.
In his motion for rehearing, Jordan argues that evidence was presented on each element of his defense because (a) Royal's fist was a deadly weapon, (b) Varley and Crumpton were a part of a hostile group to which Royal belonged, (c) Jordan testified that he was afraid of the group, (d) all members of the group were in the parking lot of the Silver Star restaurant and initially followed Jordan and Bryan as they attempted to leave, and (e) Jordan testified that he thought he was being mobbed. I believe that Jordan's argument is worthy of review, given the unique facts of this case, even if we would ultimately reach the same conclusion that we previously reached.
Jordan cites the following six cases in support of his argument: Gamino v. State , 537 S.W.3d 507 (Tex. Crim. App. 2017) ; Alonzo v. State , 353 S.W.3d 778 (Tex. Crim. App. 2011) ; Dickey v. State , 22 S.W.3d 490, 493 (Tex. Crim. App. 1999) ; Frank v. State , 688 S.W.2d 863, 868 (Tex. Crim. App. 1985) ; Sanders v. State , 632 S.W.2d 346 (Tex. Crim. App. [Panel Op.] 1982) ; Dugar v. State , 464 S.W.3d 811 (Tex. App.-Houston [14th Dist.] 2015, pet ref'd). While I do not believe these cases are directly on point, the principles discussed in these cases assist in providing a full understanding of the issues presented in this case. I discuss each case in turn.
In Gamino , the Texas Court of Criminal Appeals found that the defendant was entitled to use the threat of deadly force (as opposed to the actual use of deadly force) against three men where there was evidence that (a) all three men told the defendant that they would beat him up; (b) the defendant, who was disabled, testified that he was threatened by the men; (c) one of the men "came at him" in an aggressive manner; and (d) the State's indictment alleged that the man who came at the defendant *183 was the victim.[7] Gamino , 537 S.W.3d at 509, 512. On these facts, the Texas Court of Criminal Appeals concluded that the defendant was entitled to an instruction allowing the jury to determine whether the defendant's use of self-defense was justified by the "victim's use or attempted use of unlawful force." Id. at 512.
In this case, however, Jordan's use of deadly force was not directed against the man who approached him-Royal-but against Crumpton and Varley. Because there was no evidence that Crumpton and Varley used or attempted to use unlawful deadly force, Gamino is inapposite. Likewise, Alonzo is easily distinguishable because it involved a victim who attacked the defendant with a metal spike, whereas in this case, Royal only approached with his fists. Alonzo , 353 S.W.3d at 779. Thus, these cases do not answer the question of whether the law justified the use of deadly force against Varley and Crumpton.
Dickey[8] also does not directly aid Jordan. There, the facts established that the victim, Marvis, "started to go for his gun" when he was shot by the defendant. Dickey , 22 S.W.3d at 491. The trial court included a self-defense instruction with respect to the victim. Although the defendant was also entitled to a multiple assailant instruction, the facts demonstrated that Marvis was an assailant brandishing a deadly weapon.[9] Here, neither Varley nor Crumpton had a deadly weapon.
On the other hand, Judge Keller's concurrence, which was joined by Judge Mansfield and Judge Holland, contained the following guidance:
The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted by multiple people as a group, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force (or deadly force as the case may be). For example, if a defendant were trapped in a house with several hostile *184 individuals, some of whom were brandishing firearms and threatening the defendant, the defendant may be justified in using deadly force against a different person who was blocking an exit that would otherwise be a viable path of retreat. The use of deadly force against the person blocking the exit would be justified, even though that person possessed no firearms and made no threatening moves, because of that person's complicity with those who threatened the defendant's life. The rule concerning multiple assailants is essentially an application of the law of parties to the defendant's assailants.
Id. at 493 (Keller, J., concurring).
This language stands for the proposition that there may be circumstances where the use of deadly force is justified even when the victim did not use or attempt to use unlawful deadly force. However, this reasoning shows that something more than the victim's mere presence in the group is required. Rather, it indicates that there must be some evidence that the victim somehow sought to solicit, encourage, direct, aid, or attempt to aid in the commission of an offense. See TEX. PENAL CODE ANN. § 7.02 (West 2011). The remaining cases cited by Jordan demonstrate this point.
In Frank , the Texas Court of Criminal Appeals wrote "that a charge which is confined only to the right of self-defense against the [victim] is too restrictive if there is evidence that more than one person attacked the defendant." Frank , 688 S.W.2d at 868. In Frank , however, there was ample evidence of "a joint attack" by the victim and a second assailant whom the defendant believed had a gun. Id. at 866, 868. The defendant testified that the second assailant had previously threatened him, had "cut up quite a few people," ran towards him, and caused the defendant to fear for his life because it appeared that the victim and second assailant "were timing themselves so they could both get [the defendant] at the same time." Id. at 867. In this case, however, there is no evidence of an attack from Crumpton or Varley.
This leaves Jordan's cited cases of Dugar and Sanders . Dugar and Sanders both presented fact scenarios where the defendant was being pursued by an angry mob or group and one member of the group was carrying a deadly weapon other than a person's fist.[10] Here, although Varley was *185 a member of the group, there was no evidence that Jordan feared her or that she was part of the angry mob. Rather, the facts demonstrated that she was attempting to assist the defendant at the time of the shooting.[11] However, I believe the question of whether Crumpton was an assailant, and therefore, whether the charge on the right of self-defense was too restrictive as to him, is a closer call.
Generally, the law does not justify the use of deadly force in self-defense against victims who did not use or attempt to use unlawful deadly force.[12] See TEX. PENAL CODE ANN. § 9.31(a). However, Jordan's cited cases establish that, when certain circumstances are present, the use of deadly force may be justified against multiple assailants who did not themselves use deadly force. Although Jordan did not testify that he was specifically afraid of Crumpton or that Crumpton had threatened him, Jordan stated that he was afraid of the group and thought he was getting *186 mobbed. After Bryan was hit, Jordan testified that (1) he saw Crumpton "running over there to [Bryan] and standing over him," (2) he saw Jordan leave Bryan and motion for Stevenson to chase Jordan as he went to the car, and (3) he fired his weapon when Royal and Stevenson were fighting him.[13]
Jordan did not cite, and we have not found, any case where the defendant was entitled to a multiple assailant instruction in a situation where (1) the deadly weapon used by the assailant was his fist, (2) there was some evidence that the victim was associated with the assailant in some manner, but (3) there was no evidence that the victim himself used his fist or any other deadly weapon. Yet, the concurring opinion in Dickey asserted that a multiple assailants charge is justified when "it is clear that an attack is being conducted by multiple people as a group ... even if the recipient of that force is not engaging in the conduct that would, by itself, justify the use of force (or deadly force as the case may be)." Dickey , 22 S.W.3d at 493. The motion for rehearing raises the question suggested by the concurring opinion in Dickey ; namely, when is the evidence sufficient to show that the defendant reasonably believed the use of deadly force was immediately necessary to protect himself "against the other's use or attempted use of unlawful deadly force" because there is some evidence from which a jury could reasonably infer that the victim and the assailant were conducting an attack as a group. TEX. PENAL CODE ANN. § 9.32(a)(1)(A).
Accordingly, while the cases cited by Jordan are distinguishable from the facts in this case, that does not mean that the issues he raises are not worthy of consideration. Rather, Jordan's motion for rehearing raises two questions which fall somewhere between cases where a multiple assailant charge is clearly not warranted and the cases cited by Jordan. First, what quantum of evidence was Jordan required to present to demonstrate that Crumpton was an assailant?[14] Second, even assuming that Crumpton was an assailant, does the law justify the use of deadly force against an assailant when the defendant fears only another's fist? Stated simply, at what point-when viewed from the defendant's perspective-is there sufficient evidence that a defendant reasonably believed that what approached him was not one man with his fists displayed with others standing nearby, but was instead an angry mob led by one man with his fists displayed?
The answers to these questions become particularly complicated in this case because the basis for Jordan's alleged reasonable belief that the use of deadly force was immediately necessary to "protect [himself] against [Crumpton's and Varley's] use or attempted use of unlawful deadly force" was Royal's threatening fists. See TEX. PENAL CODE ANN. § 9.32(a)(1)(A). A fist is not a deadly weapon, per se, but may become so in the manner of its use. See Turner v. State , 664 S.W.2d 86, 90 (Tex. Crim. App. [Panel Op.] 1983) ; Brooks v. State , 900 S.W.2d 468, 473 (Tex. App.-Texarkana 1995, no pet.). For example, a heavyweight boxer's fists would be more likely to inflict serious bodily injury or death than those of a 100-pound *187 asthmatic. Yet, a group of strong men including a 100-pound asthmatic could inflict serious bodily injury or death with the combined force of their fists. Thus, the question of whether the victim was a member of a mob led by an assailant who was menacing the defendant with his fists, or was merely an individual standing next to an assailant who was acting alone, is significant in deciding whether the defendant reasonably believed that the use of deadly force was immediately necessary to protect himself "against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(1)(A).
While I believe this question should ultimately be decided by a jury, the motion for rehearing presents the issue so that we may clarify when the evidence would be sufficient to let the jury decide that question.

The surveillance recording showed Jordan and Bryan pausing very briefly as they said something to Varley before walking out to the parking lot.

Cashatt and Walker testified that a fist can be a deadly weapon.

See Morales v. State , 357 S.W.3d 1, 4-5 (Tex. Crim. App. 2011).

If a defendant is not entitled to an instruction and the trial court nonetheless gives it, any error in the instruction is harmless. Hughes v. State , 897 S.W.2d 285, 301 (Tex. Crim. App. 1994).

The record fails to reflect any ruling on the State's motion in limine.

Moreover, Jordan now argues that such evidence was admissible under Rule 403, an argument that was not considered by the trial court.

This case dealt with the application of Section 9.04 of the Texas Penal Code, which reads,
The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.
Tex. Penal Code Ann. § 9.04 (West 2011).

In Dickey , the defendant and Carlton Brown were at Zerick Marvis' home when an argument broke out between the three of them. Dickey , 22 S.W.3d at 491. The defendant testified that he felt as if Marvis and Brown were about to turn on him. Id. He then stated, "[Marvis] had a pistol in his pants pocket and he had his hand on the gun. I heard him cock the hammer back. [Brown] started to go for his gun that he had in his front waist band. I thought they were going to team up on me so I pulled my Glock .40 from my waist and fired at [Brown]." Id.
During his trial for Brown's murder, "the charge specified that if the jury found that it reasonably appeared to [the defendant] that he was in danger 'from the words or conduct or both of Carlton Brown,' then it should acquit [the defendant] on the grounds of self-defense." Id. at 492. The defendant requested a multiple assailant instruction and argued that the charge should have permitted the self-defense justification for Marvis' actions as well. Id. The Texas Court of Criminal Appeals agreed.

The Texas Court of Criminal Appeals concluded in Dickey that the defendant was not harmed by the lack of the instruction because, although the defendant testified he feared that Marvis and Brown were teaming up on him, "there [wa]s absolutely nothing in the actions of either Marvis or Brown which would indicate their collusion" and "no explanation as to why [the defendant] would think the other two were teaming up on him." Id.

In Dugar , the defendant and his brother were leaving the scene of a party when their vehicle "cut off a Black Cadillac, which then ignited a fit of road rage." Dugar , 464 S.W.3d at 814. They were chased by people in the Cadillac and an entourage of vehicles, including a Ford Focus, which had also been seen at the party. Id. The defendant's vehicle was sandwiched between the Cadillac and the Ford Focus when he hit the Ford Focus, causing it to spin out of control. Id. at 814.
After the accident, the defendant and his brothers entered a parking lot occupied by fifteen or sixteen people standing outside of their vehicles. Id. The defendant described the group as "vicious" and "ferocious." Id. The defendant saw a man in the crowd display a handgun, which caused the defendant to retrieve his own. Id. In response to this action, another man in the crowd yelled, "[W]e got weapons too!" Id. The defendant's brother testified that he saw several handguns in the crowd and stated that the crowd was "all after us." Id. at 815. As the defendant drove away, he saw that the crowd was pursuing him on foot. Id. He fired his gun into the crowd and was quickly met with return fire. Id. at 815. The defendant's bullet struck one of the passengers of the Cadillac, who, according to witness testimony, was not armed at the time of the shooting. Id.
The trial court determined that the defendant was not entitled to an instruction on self-defense because the victim was an innocent bystander. See Tex. Penal Code Ann. § 9.05 (West 2011). The Fourteenth Court of Appeals disagreed and concluded that the defendant was entitled to an instruction on self-defense from multiple assailants because (a) the defendant was placed in a hostile situation moments before the shooting which resulted in a car accident, (b) the defendant was pursued by a group of vicious and ferocious men that he believed were going to harm him, (c) "the crowd was akin to an angry mob," (d) the defendant saw that there was a gun in the crowd and heard a statement that others in the crowd also had weapons, and (e) the crowd was pursuing him on foot as he left the parking lot. Dugar , 464 S.W.3d at 818.
In issuing its decision in Dugar , the Fourteenth Court of Appeals looked to Sanders for guidance. In Sanders , the defendant suffered a concussion and myocardial contusion when he was struck with a pool cue by a person other than the victim during an argument near a pool table in a Dallas beer joint. Sanders , 632 S.W.2d at 346-47. The defendant's brother testified that he saw the defendant stagger out of the establishment "with some people hollering, arguing at him ... trying to get them other people off him." Id. at 347. The defendant ran to the parking lot and was pursued by "white people [who] were yelling and hollering and chasing appellant with a pool cue." Id. "Racial epithets were exchanged." Id. at 346. The defendant testified that another brother handed him the weapon that he fired. Id. The defendant was asked, "You were in fear of your life from these people; is that right?" He answered, "I was trying to get away from them to save my life." Id. at 347. The Texas Court of Criminal Appeals determined that the defendant was entitled to an instruction on self-defense from multiple assailants after concluding that there was evidence of an attack or threatened attack at the hands of more than one assailant. Id. at 348.

The State indicted this case as one offense with two victims. However, in reality, the facts established two offenses with one victim each. See Miles v. State , 259 S.W.3d 240, 249 (Tex. App.-Texarkana 2008, pet. ref'd) (holding that the allowable unit of prosecution for the offense of deadly conduct "is each discharge of the firearm" rather than each of the individual crowd members present when the gun was discharged). Had the State indicted this case as two offenses, it could possibly have avoided the justification defense for the offense arising out of the gunshot that hit Varley because there is no evidence she was a participant in the crowd's activities. Yet, having indicted the case as one offense, I question whether the State could avoid the justification defense for the offense arising out of the bullet that hit Crumpton as well.

See Macias v. State , No. 13-13-00319-CR, 2015 WL 1181191, at *6 (Tex. App.-Corpus Christi Mar. 12, 2015, pet. ref'd) (mem. op., not designated for publication) ("The language of these provisions logically implies that 'the other' who uses or attempts to use unlawful force ... is 'the person against whom the force was used." ') (quoting Tex. Penal Code Ann. § 9.31(a)(1) ); Ortiz v. State , No. 06-98-00280-CR, 1999 WL 1054694, at *2 (Tex. App.-Texarkana Nov. 23, 1999, pet. ref'd) (finding that the defensive theory of self-defense of a third party was unavailable when the defendant shot into a hostile group to protect his cousin where there was affirmative evidence that the victim did not have a deadly weapon). Although these unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." Carrillo v. State , 98 S.W.3d 789, 794 (Tex. App.-Amarillo 2003, pet. ref'd).

The evidence at trial also showed that Jordan shot toward Royal and Crumpton's direction as they were running away.

See Tanguma v. State , 721 S.W.2d 408, 412 (Tex. App.-Corpus Christi 1986, pet. ref'd) (concluding that justification of self-defense was not available where assailant, although present in the defendant's periphery, had abandoned his attack on the defendant at the time the defendant discharged his weapon).